Barnard *et al. v.* Sherley.

Filed Nov. 21, 1893.

———————◆———————

No. 16,187.

## BARNARD ET AL. *v.* SHERLEY.

WATERCOURSE.—*Befouling Same.*—*Artesian Well.*—*Sanitarium.*—*Injunction.*—*Damages.*—Where one sinks an artesian well upon his own land, and uses the water to bathe the patients in a sanitarium or hospital erected by him on said premises, he is not liable to injunction and damages for allowing the water to flow into a stream which is the natural watercourse of the basin in which the artesian well is situated, the owner being free from negligence or malice and using all due care in avoiding injury to his neighbor.

SAME.—*Right to Have Water Descend in Pure State.*—*Exceptions to.*—*Reasonable Use a Question of Fact.*—The natural right to have the water of a stream descend in its pure state must yield to the equal right of those above. It is not, under all circumstances, an unreasonable or unlawful use of a stream to throw or discharge into it water or impure matter; and whether, in any given case, such use would be reasonable or not, is a question for the jury.

DAMAGES.—*Damnum Absque Injuria.*—*Lawful Work or Enterprise.*—*Due Care.*—Where a work is lawful in itself, and can not be carried on elsewhere than where nature located it, or where public necessity requires it to be, then those liable to receive injury from it have a right only to demand that it shall be conducted with all due care, so as to give as little annoyance as may be reasonably expected; and any injury that may result, notwithstanding such care in the management of the work, must be borne without compensation.

Barnard *et al. v.* Sherley.

INJUNCTION.—*When Remedy Lost.*—*Remaining Silent.*—*Legal Rights.*— A person may lose his remedy by injunction, by remaining silent and inactive and allowing acts to be done and expenses to be incurred, and be compelled to assert his rights at law.

HARMLESS ERROR.—*Pleading.*—*Sustaining Demurrer to a Paragraph of.*— It is only where the allegations of a proper paragraph of pleading may be established by proof under other paragraphs, that the sustaining of a demurrer to the paragraph in question will be held harmless.

Opinion on petition for a rehearing by HOWARD, J.

From the Morgan Circuit Court.

*J. H. Jordan, O. Matthews* and *W. R. Harrison,* for appellants.

*W. S. Sherley, J. V. Mitchell* and *M. H. Parks,* for appellee.

HOWARD, J.—Since May, 1886, the appellee has been the owner of certain lots and lands, in and adjoining the city of Martinsville, occupied by her as a farm. Appellants are the owners of certain lots in the city of Martinsville, adjoining the lands of appellee. During the years 1887 and 1888 a well was drilled upon appellant's lots to the depth of 800 feet, in search of gas. Instead of gas a large volume of water flowed from the well, and has so continued to flow ever since. The water having been found, by analysis, to possess curative properties for certain diseases, appellants erected a bath house upon their said lots, to be used for bathing persons afflicted with diseases, who might be benefited by the artesian waters.

On the 16th day of September, 1889, the appellee filed her complaint against the appellants, in the Morgan Circuit Court, alleging that appellants, after using said artesian water in bathing the bodies of diseased persons, the same having all manner of diseases, including syphilitic, and after said water had become befouled and pol-

luted thereby, cause the same to be conveyed in a tile ditch under ground, constructed by them, to the lands of appellee, causing such water to flow upon and over the lands of appellee and into a natural stream of water running thereon, causing said natural stream of water to become befouled and polluted thereby, exposing the same to the stock pasturing and feeding upon appellee's said land, where said stock is accustomed to run, feed and pasture, such as milch cows, horses and hogs, and the same drinking said water in its befouled and polluted condition, as aforesaid; that said stream of water is a small spring branch of pure water, having its source in springs about one mile from appellee's land, and confined in a small channel upon appellee's land, and passing through appellee's land the distance of fifty-three rods, and having no outlet, but sinking into the lands of appellee, and others below; that said artesian water in its polluted condition, so caused by appellants as aforesaid, and so caused to flow upon appellee's land, accumulates in great ponds of water upon appellee's said premises, becoming polluted and stagnant thereon, to the great and irreparable damage of appellee and her said land, and to the stock pasturing and feeding thereon, also endangering the health of persons living upon said land and drinking the milk from said cows; that said mineral water, from said artesian well, never at any time flowed upon appellee's land and into said stream of water, by percolation or otherwise, until the same was caused to flow thereon and therein by appellants, in manner as aforesaid. Concluding with a demand for damages in the sum of $1,000, and praying that appellants be forever enjoined from causing and permitting said water, from said well, to run upon and flow over the lands of appellee, and into said stream of water, and for other proper relief.

A demurrer having been overruled to this complaint, appellants answered by general denial, and also by special plea. There was a motion to strike out parts of the special answer, which motion was sustained. A demurrer was afterwards filed to the second paragraph of the answer, which was sustained. Appellants moved for a jury to try the cause, and also moved for a jury to answer questions of fact, both of which motions were overruled. To all of these rulings appellants duly excepted.

The cause was submitted to the court, and the court, having heard the evidence, found for the appellee, assessing her damages in the sum of fifty dollars, and appellants were "enjoined from causing or permitting the water of the artesian well, which shall have been used at their sanitarium and bath house   *   *   *   in bathing or washing persons afflicted with syphilis or other infectious ailment or disorder, to flow into said branch or stream   *   *   *   or over and upon the lands of plaintiff;   *   *   and are further enjoined and restrained from polluting or corrupting the water from said well, which may be left by them to flow into said branch and stream, in such manner that the water of said branch and stream other than that flowing from said well, may be rendered dangerous or injurious to live stock."

A motion for a new trial was overruled.

Various errors are assigned and discussed, but the controlling questions in the case arise under the ruling of the court in sustaining the demurrer to the second paragraph of the answer. This paragraph of answer, omitting the parts stricken out as not material, or as being such as might have admitted of proof under the general denial, is as follows: "For further answer, they (appellants) say that the stream of natural water set forth in plaintiff's complaint is a small stream and branch which flows from sources northeast of the city of Martinsville,

thence southward to near the center, north and south, of said city, thence westward across said city, thence south to and across plaintiff's said land, and has so flowed for many years prior to plaintiff's having any interest in said land; that the said well from which said waters flow upon the said lots of defendants was dug and bored and the flow thereof caused by an association of many citizens of said city of Martinsville, with the assent and approval of plaintiff; that the only means or way of escape of said water is in and along said branch over the said lands of plaintiff; that for more than one year after the said well was so dug and bored, the waters therefrom flowed from defendants' said lots into said branch by open ditches, and were so caused to flow by the said association of persons, who dug and bored the (same), and without objection by plaintiff, and with her acquiescence; that thereupon and thereafter, upon testing said waters by scientific analysis, by drinking and using the same in baths, they were found to be of great value, and to have highly curative properties, and to be of great service and value in healing persons afflicted with various disorders, rheumatism, neuralgia, kidney affections, paralysis and many other disorders.

"Whereupon defendants erected a bath house to utilize said waters for the benefit of all persons so afflicted, upon their said lots at a cost of ten thousand dollars, and have treated, benefited, and cured hundreds of persons from all parts of the country so afflicted as aforesaid, and are still engaged at their said bath house in healing and curing such sick and afflicted; that in erecting said bath house and in using said waters of said artesian well for the healing of persons as aforesaid, and in all defendants did in the use of said waters and the draining of the same away, as complained by said plaintiff, said defendants used all proper and possible care to avoid injury, dam-

Barnard *et al. v.* Sherley.

age or inconvenience to said plaintiff and all others, and only did such acts as were proper and necessary to be done in the use of said waters for the purposes aforesaid; that said plaintiff stood by and assented to and acquiesced in the said expenditure of said sum in the erection of said bath house by defendants; that after so erecting said bath house defendants placed under ground a drain, made of porous tile, to convey the surplus water from said artesian well under ground to the branch above plaintiff's land, because the said branch was the only natural and only convenient outlet for said water, and did not thereby materially increase the flow of water in said branch.''

The question presented for decision is new in this State: Whether one who sinks an artesian well upon his own land, and uses the water to bathe the patients in a sanitarium or hospital erected by him on said premises, is liable to injunction and damages for allowing the water to flow into a stream which is the natural watercourse of the basin in which the artesian well is situated, the owner being free from negligence or malice and using all due care in avoiding injury to his neighbor.

In a Pennsylvania case the plaintiff was the owner of property on one side of a street, and brought an action for damages for alleged injury to his property by the defendant company, who had constructed its elevated road, on its own land, on the other side of the street. It was alleged that the noise, dust, smoke, and cinders, and the constant jar of passing trains interfered with plaintiff's enjoyment of his property and lessened its value.

The court in that case premised that under the constitution of Pennsylvania the company would only be liable if, under the same circumstances, an individual would be liable at common law; and held that in case a natural person were operating the road under the same

circumstances he would not be responsible in damages, for the reason that he would have a right to the reasonable use and enjoyment of his property, and if in such use, without negligence or malice on his part, a loss should unavoidably fall upon his neighbor he would not be liable therefor.

No principle of law is better settled than that a man has the right to the lawful use and enjoyment of his own property, and that if, in the enjoyment of such right, without negligence or malice, an inconvenience or loss occurs to his neighbor, it is a wrong for which there is no liability. This must be so or every man would be at the mercy of his neighbor in the use and enjoyment of his own.

No man is answerable in damages for the reasonable exercise of a right, where it is accompanied by a cautious regard for the rights of others, where there is no just ground for the charge of negligence or unskillfulness, and where the act is not done maliciously. *Panton* v. *Holland*, 17 Johns. *99.

We need not consume time by further citation of authorities for so plain a proposition. It is settled law. It is true that this principle is qualified to a certain extent. A man may not carry on a business which poisons the air and renders it unhealthy in a thickly populated neighborhood, and especially in the center of a large city. So establishments which involve danger, as powder mills and certain kinds of manufactories, must seek a secluded place where as few persons may be inconvenienced as possible. These exceptions to the general rule are well established. But the great interests of mankind must go on unhampered. Railroads must reach cities; the treasures of the earth must be drawn from the mines; factories and mills must send forth noise, dust, and smoke. Inconveniences resulting from

such causes must be endured by individuals for the general good, otherwise we should have to forego a multitude of the blessings of modern civilization.. *Penn. Co.* v. *Marchant*, 119 Pa. St. 541, and authorities there cited.

In *Gannon* v. *Hargadon*, 10 Allen, 106, the court held that "The right of a party to the free and unfettered control of his own land above, upon and beneath the surface can not be interfered with or restrained by any considerations of injury to others which may be occasioned by the flow of mere surface water in consequence of the lawful appropriation of land by its owner to a particular use or mode of enjoyment. * * * A party may improve any portion of his land, although he may thereby cause the surface water flowing thereon, whencesoever it may come, to pass off in a different direction and in larger quantities than previously. If such an act causes damages to adjacent land, it is *damnum absque injuria*."

The law is the same in this State. *Shelbyville, etc., Turnpike Co.* v. *Green*, 99 Ind. 205.

Where, in Massachusetts, a riparian owner built a dam across a stream, to create a fish pond on his own land, it was held to be a reasonable use of the water; and a mill-owner below had no cause to complain of it, either at common law or under the statute of that State as to mills. Yet, it seems that a mill-owner may not enlarge the quantity of water flowing in a stream from his mill through the land of a lower proprietor by turning a new stream into his pond. The wrong consists in turning any water upon the land which does not naturally flow there. This, however, does not extend to preventing a proprietor upon a stream from digging ditches, or doing other acts in the proper cultivation of his land, though the effect of it is to increase the quantity of water in the stream. Washburn Easements (4th ed.), p. 375.

In California, a man, in irrigating his farm, turned a stream upon it from an adjacent ravine. The water percolated through the soil into a neighboring mine in such quantities as to ruin the mine. It was held that the farmer was reasonably exercising his right to irrigate his land, and was responsible only for the injuries caused by his negligence or unskillfulness, or for such as were caused by any wanton abuse of his right. *Gibson* v. *Puchta*, 33 Cal. 310.

In another California case, a land-owner permitted the water taken from artesian wells on his lands, and carried through a ditch to irrigate his fields, to percolate through the ditch to the injury of his neighbor's land. It was found that at small expense the water might have been drained from the ditch so as probably to prevent the injury, and he was accordingly enjoined from continuing the injury. What might have been the opinion of the court in case the fields could not be irrigated without injury to the neighbor does not appear. *Parker* v. *Larsen*, 86 Cal. 236.

The general rule in England is, that a person discharging noxious substances into a stream will be liable to the riparian owners lower down for any damage occasioned; yet some exception seems to be made in favor of mining operations. Bainbridge Law of Mines, 3d ed., 517, says: "It should also be remembered that the prosperity of a mining country and its inhabitants depends upon the successful efforts of the adventurer. The value of all property in the vicinity of mines is inseparably associated with the spirit of adventure. The miner, therefore, should not be harassed in his operations by claims of an unsubstantial or imaginary character; for the benefits he confers generally far surpass the injuries he may commit."

In Leading Cases on Mines, Blanchard and Week's

Notes, the exception as to mineral products is also made: "But a right to throw refuse from mines into a natural stream, or discharge into it water which has been used for the precipitation of minerals and rendered noxious, may be acquired by prescription, custom, or user. The same rule applies to smelting and washing processes." *Ib.* 721, and authorities there cited.

In this country the severity of the English rule is still further relaxed: "If one builds a dam upon his own premises and thus holds back and accumulates the water for his benefit, or if he brings water upon his premises into a reservoir, in case the dam or the banks of the reservoir give away and the lands of a neighbor are thus flooded, he is not liable for the damage without proof of some fault or negligence on his part." *Losee* v. *Buchanan,* 51 N. Y. 476, and authorities cited. "As a general proposition, it is safe to say that the owner of land has a right to make reasonable use of his property; and that right extends as well to an unlimited distance above the earth's surface as to an unlimited distance below." *Garland* v. *Towne,* 55 N. H. 57.

The right to flowing water is a right incident to property in land, and while it is a right common and equal to all through whose land it runs, yet, as one of the gifts of Providence, each proprietor has a right to a just and reasonable use of it as it passes through his land. What is such a just and reasonable use may often be a difficult question, depending on various circumstances. *Elliot* v. *Fitchburg R. R., Co.,* 10 Cush. 191.

Sewage and waste material may be cast into streams, if material injury is not thereby caused. The right of one proprietor to have the stream descend to him pure must yield in a reasonable degree to the right of the upper proprietors, whose occupation of their own lands, and whose use of the water for mill, manufacturing, domes-

Barnard *et al. v.* Sherley.

tic, or other purposes, will tend to make the water more or less impure. So it is of public importance that proprietors of useful manufactories should not be held responsible for slight injuries, or even some degree of interference with agriculture. In regard to some waste deposits in such streams there would seem to be no question. The uniform practice, the convenience, and, in some instances, the indispensable necessity, would seem sufficiently to decide such cases. Gould Waters, section 220.

In *Health Dept. City of New York* v. *Purdon*, 99 N. Y. 237, which was an action to enjoin the sale of adulterated tea, it was said that, "Courts will not in all cases interfere by way of injunction to restrain the continuance of an illegal trade, the abatement of a nuisance or the prosecution of a dangerous employment. Its power, however, to do so in case of the exercise of any trade or business which is either illegal or dangerous to human life, detrimental to health, or the occasion of great public inconvenience, is not only conferred by the provisions of the statute, but belongs to the general powers possessed by courts of equity to prevent irreparable mischief and obviate damages from which no adequate remedy exists at law."

In that case it was found that, although the teas were adulterated, yet there was no sufficient evidence that the use of the teas was dangerous to human life or detrimental to health, and, therefore, the injunction was refused.

In *Owen* v. *Phillips*, 73 Ind. 284, it was attempted to enjoin the reërection of a flouring mill which had been burned, the claim being made that the mill was a nuisance, and that it could not be operated without becoming a nuisance; that the smoke and cinders made the water of plaintiff's cisterns and wells foul and impure,

and that the noise, smoke, dust, dirt, and offensive odors, caused by the running of the mill, essentially interfered with plaintiffs' enjoyment of life and property.

The following instruction in that case was objected to by the plaintiffs, because the court modified it by inserting the words *materially and essentially:* "If the jury find from the evidence that the personal enjoyment of the plaintiffs in their residence has been and will be *materially and essentially* lessened by either the noise, smoke, dust, dirt, cinders, horses, mules or teams, caused by the running and use of said mill, then the allegations of the complaint have been sustained."

The instruction, as so modified, was, however, approved by this court, the court adding that "A lawful business may be so conducted as to become a nuisance, but in order to warrant interference by injunction, the injury must be a material and essential one;" quoting, also, with approval from the opinion rendered by COOLEY, J., in *Gilbert* v. *Showerman*, 23 Mich. 448, that in such cases, "minor inconveniences must be remedied by actions for the recovery of damages rather than by the severe process of injunction." See, also, *Bowen* v. *Mauzy*, 117 Ind. 258.

"The granting or refusal of an injunction rests, in each particular case, in the sound discretion of the court. An injunction ought not, therefore, to be granted when it would be against good conscience, or productive of great hardship, oppression or injustice, or of public or private mischief." *City of Logansport* v. *Uhl*, 99 Ind. 531, and authorities there cited.

The natural right to have the water of a stream descend in its pure state, must yield to the equal right of those above. Their use of the stream for mill purposes, and the other manifold purposes for which they may lawfully use it, will tend to render it more or less impure.

The water may thus be rendered unfit for many uses for which it had before been suitable; but so far as that condition results from a reasonable use of the stream, in accordance with the common right, the lower riparian proprietor has no remedy. When the population becomes dense, and towns or villages gather along its banks, the stream naturally suffers still greater deterioration. Against such injury, incident as it is to the growth and industrial prosperity of the community, the law affords no redress. So, in cities and towns, with their numerous inhabitants and diversified business, with their mills, shops and manufactories; with their streets and sewers; all the products and means of a high civilization, it would be impossible that the pure streams that flow in from the farmsides should remain uncontaminated; and those that live upon the lower banks of such streams must, for the general good, abide the necessary results of such causes. *Merrifield* v. *City of Worcester*, 110 Mass. 216.

That it is not, under all circumstances, an unreasonable or unlawful use of a stream to throw or discharge into it waste or impure matter; and that whether, in any given case, such use would be reasonable or not, is a question for the jury. See Angell Watercourses (7th ed.), section 140d.

In the case before us, the stream flowed through the heart of the city of Martinsville before it reached the lands of appellee. Will it be said that there is any liability for contamination from the refuse of the city? Must it be that one who lives on the lower lands on the banks of a stream shall forbid forever the founding of a city on the lands above; forbid the grading of streets, the building of sewers, the erection of mills, factories, hospitals or other means of livelihood, comfort and convenience of the inhabitants?

A case, in many of its features, resembling that now before the court is the well considered case of the *Pennsylvania Coal Co.* v. *Sanderson*, 113 Pa. St. 126. That was a mining case, and the chief question was as to the liability of the mine-owners for the flowage of foul water from the mine into a stream which was the natural watercourse of the basin in which the mine was situated.

The plaintiff in that case, Mrs. Sanderson, had purchased a tract of land in the city of Scranton, on the Meadow Brook, near its mouth. The existence of the stream, the purity of its water and its utility for domestic and other purposes, it is said, was a leading inducement to her purchase of the land. She erected a house, threw dams across the brook to form a fish and ice pond and to supply a cistern, and the water was forced, by hydraulic pressure, from the cistern to a tank in the house, and was used for domestic purposes and for a fountain. The plaintiff alleged, in her complaint, that the large volume of mine water, which the defendant company poured into the brook above, had corrupted the stream to such an extent as to render it totally unfit for domestic use; that the fish were destroyed, the pipes corroded, and her entire apparatus for utilizing the water rendered worthless. She brought her action to recover damages for such pollution of the stream.

In the course of the opinion the court says: "It must be conceded, we think, that every man is entitled to the ordinary and natural use and enjoyment of his property; he may cut down the forest trees, clear and cultivate his land, although in so doing he may dry up the sources of his neighbor's springs, or remove the natural barriers against wind and storm. If, in the excavation of his land, he should uncover a spring of water, salt or fresh, acidulated or sweet, he will certainly not be obliged to

Barnard *et al. v.* Sherley.

cover it again, or to conduct it out of its course, lest the stream, in its natural flow, may reach his neighbor's land. * * * In sinking his well, he may intercept and appropriate the water which supplies his neighbor's well: *Acton* v. *Blundell*, 12 M. & W. 324; *Wheatley* v. *Baugh*, 1 Casey, 528; *Haldeman* v. *Bruckhart*, 9 Wr. 514; or, if his own well is so close to the soil of his neighbor, as to require the support of a rib of clay or of stone on his neighbor's land, to retain the water in the well, no action will lie against the owner of the adjacent land for digging away such clay or stone, which is his own property, * * Wharton on Neg., 939. * * *

"So also each of two owners of adjoining mines has a natural right to work his own mine, in the manner most convenient and beneficial to himself, although the natural consequence may be, that some prejudice may occur to the owner of the adjoining mine: *Smith* v. *Kendrick*, 7 C. B. 505.

"One mine owner may thus permit water, naturally flowing in his own mine, to pass off by gravitation into an adjoining or lower mine, so long as his operations are carried on properly and in the usual manner. Bainbridge on Mines, 297.

"To the same effect are *Wilson* v. *Waddell*, L. R., 2 Appeal Cas. 95; *Crompton* v. *Lea*, L. R., 19 Eq. 115.

"The defendants being the owners of the land, had a right to mine the coal. It may be stated, as a general proposition, that every man has the right to the natural use and enjoyment of his own property, and if, while lawfully in such use and enjoyment, without negligence or malice on his part, an unavoidable loss occurs to his neighbor, it is *damnum absque injuria*, for the rightful use of one's own land may cause damage to another, without any legal wrong. * * *

" 'It is established,' says COTTON, L. J., in *West Cumberland Iron Co.* v. *Kenyon*, 11 L. R., 6 Ch. Div. 773, 'that taking out mineral is a natural use of mining property, and that no adjoining proprietor can complain of the result of careful, proper mining operations.' In the same case BRETT, L. J., says:   'The cases have decided that where that maxim (*sic utere tuo ut alienum non lœdas*) is applied to landed property, it is subject to a certain modification; it being necessary for the plaintiff to show, not only that he has sustained damage, but that the defendant has caused it by going beyond what is necessary in order to enable him to have the natural use of his own land.' L. R., 11 Ch. Div. 787.

"The right to mine coal is not a nuisance in itself: It is, as we have said, a right incident to ownership of coal property, and when exercised in the ordinary manner, and with due care the owner can not be held for permitting the natural flow of mine water over his own land, into the watercourse, by means of which the natural drainage of the country is effected.   *   *   *

"The defendants were engaged in a perfectly lawful business, in which they had made large expenditures, and in which the interests of the entire community were concerned; they were at liberty to carry on that business in the ordinary way, and were not, while so doing, accountable for consequences which they could not control; as the mining operations went on, the water by the mere force of gravity ran out of the drifts and found its way over the defendant's own land to Meadow Brook. It is clear that for the consequences of this flow, which by the mere force of gravity, naturally, and without any fault of the defendants, carried the water into the brook and thence to the plaintiff's pond there could be no responsibility as damages on the part of the defendants.   *   *   *

"It is said the defendants created an artificial water-

course from their mine to Meadow Brook, but this
artificial watercourse was upon their own land, and con-
ducted no more water * than, by the natural conformation
of the surface, could otherwise have reached it.    If it be
suggested that the defendants might have extended this
artificial water way, in form of a sewer, to some point of
safety, it may be asked where, short of the sea, might
the sewer be discharged that the same complaint might
not be made?    *    *    *

"Nor do we say, that a miner, in order that his mines
may be made available, may enter upon his neighbor's
lands, or inflict upon him any other immediate or direct
injury, but we do say, that in the operation of mining,
in the ordinary and usual manner, he may upon his
own lands, lead the water which percolates into his
mine, into the streams which form the natural drainage
of the basin, in which the coal is situate, although the
quantity, as well as the quality, of the water in the
stream may thereby be affected."

The foregoing case of the *Pennsylvania Coal Co.* v. *San-
derson*, and the reasoning of the court, seem to be closely
in point with the case at bar.    In both cases the owners
cause water to rise from the earth, to become foul, and
then to be carried by an artificial drain and discharged
into a running stream, the natural watercourse of the
basin or valley in which the water rises, and into which
stream the water would naturally flow if left to itself; in
both cases the owners were engaged in a lawful and nec-
essary work, of great advantage to mankind at large,
and particularly to the community in which they oper-
ated, the one in mining out of the earth and distribut-
ing coal for heating and industrial uses, and the other
in also taking out of the earth mineral water for healing
and curing the infirm; both were free from fault or neg-
ligence in conducting their business, and in avoiding,

so far as possible, all injury to others, the injury in each case being but the necessary incident of a lawful business; in each case there was no other place but the stream for the water to go, so that if it were unlawful to discharge the water into the stream, then the enterprise itself, of necessity, would be at a standstill, and a lawful business thus come to an end because it could not be lawfully carried on.

It would seem that the decisions show that when a business is dangerous, unhealthful, or otherwise greatly injurious to a community, or to an individual, and it is possible to avoid the injury by a more careful management, or even, if necessary, by a removal of the works to a more secluded or less objectionable place, then the owners of the noxious business will be mulcted in damages, and, if necessary, restrained by the courts.

We have seen that, in the case of *Parker* v. *Larsen, supra,* when it appeared that the defendant could flow water from his artesian wells over his fields without injury to his neighbor, but did not do so, he was enjoined.

In the case of *Indianapolis Water Co.* v. *American Straw Board Co.,* 53 Fed. Rep. 970, where there was a discharge of refuse matter from a straw-board factory into a nonnavigable river, used by a water company as a source of supply for furnishing a city with water for domestic and other purposes, it was held that injunction would lie to restrain such pollution of the water supply.

In *Kinnaird* v. *Standard Oil Co.,* 89 Ky. 468, defendant had stored petroleum, which leaked and percolated through the ground until it reached plaintiff's spring of water. *Ottowa Gas, etc., Co.* v. *Graham,* 28 Ill. 73, was a similar case, the offensive substances percolating from the gas works into plaintiff's well. Also *Pottstown Gas Co.* v. *Murphy,* 39 Pa. St. 257. Either of two courses could

Barnard *et al.* *v.* Sherley.

have been followed by the offending defendants in these last three cases, they could improve their works so that the oils would not leak and percolate through the earth to the fouling of the water, or they could remove their works to another locality. Accordingly, damages were assessed in each case for the injury.

So of various kinds of dangerous or offensive mills, factories, or other establishments or occupations. If they are conducted in such a manner as to materially and essentially injure adjoining proprietors, the owners may be subject to suits for damages, or, in case the injury is continuous, the business may be enjoined. But, in this class of cases, either a change in the method of conducting the business, so as to avoid the injury, or else a total removal of the works to another and safer locality may be had.

But the case before us does not belong to this class. Railroads must reach our cities and the marts of trade; they can not do business elsewhere. Mines and mineral springs, natural gas and oil wells, can not be removed; they must be operated where they are, or totally abandoned. Where, therefore, a work is lawful in itself, and can not be carried on elsewhere than where nature located it, or where public necessity requires it to be, then those liable to receive injury from it have a right only to demand that it shall be conducted with all due care, so as to give as little annoyance as may be reasonably expected; and any injury that may result, notwithstanding such care in the management of the work, must be borne without compensation. It is then a case in which the interests and convenience of the individual must give way to the general good.

The demurrer to the second paragraph of the answer in this case admits the facts stated in the answer to be true. We have then to consider the statements of the

answer as facts, and in the light of these facts examine whether the business of appellants is a lawful business, and whether it is carried on with due care and so as to do no injury to appellee which can reasonably be avoided.

From the answer, then, we learn that said artesian well was dug, and its waters caused to flow upon appellant's said lands, by an association of the citizens of Martinsville, with the assent and approval of appellee; that the waters from said well flowed into a stream which, after running through said city, passed over the lands of appellee, and for more than a year so continued to flow, with the acquiescence of appellee; that the only means or way of escape of the water from said well is in and along said branch, which is the only natural outlet for the same, and that the increase of the flow of water in said stream was not materially increased by the water from said artesian well; that afterward, by scientific analysis, and by the use of said water for drinking and bathing, it was discovered that the waters were of great medicinal value, and possessed of curative properties in the healing of persons afflicted with rheumatism, neuralgia, paralysis, kidney affections, and various other diseases; that thereupon, for the purpose of utilizing said waters in the cure of persons so sick and afflicted, appellants erected upon their said lots a bath house at a cost of $10,000, in which they have since continued to treat those affected as aforesaid, using said waters.

It would seem, from these statements, that the business in which appellants are engaged is a lawful one. They sunk, or permitted to be sunk, on their own land, an artesian well. This they had a perfect right to do, and in addition it would appear that this work was done with the help of many citizens of the town, and with the acquiescence of appellee as well. Such help and acquiescence, however, were not necessary to make the act of

sinking the well lawful. It appears that the stream into which the waters flowed naturally from the well is a spring branch, which passes directly through the city before it reaches either the land of appellants or that of appellee. This stream is not only the natural outlet for the drainage of said lands, but is the only means or way of escape of said artesian water.

But was it lawful to build a sanitarium for the cure of the sick, and to bathe in the waters those afflicted with disease? It was certainly lawful to do so, provided the sanitarium is properly conducted and well managed, so as to do no injury to any person which, reasonably and with due care, can be avoided. This court has already said: "Hospitals and homes for the sick are very far from being nuisances *per se.* They are wise and beneficent charities, to be fostered and encouraged by liberal legislation, and not to be suppressed or even discouraged by what may seem to be harsh or restrictive laws." *Bessonies* v. *City of Indianapolis,* 71 Ind. 189.

But was due care exercised in the construction and management of the sanitarium, and in the drainage of the waters therefrom? The answer states: That in erecting said bath house and in using said waters for the healing of persons, as aforesaid, and in all that appellants did in the use of said waters and the draining of the same away, appellants used all proper and possible care to avoid injury, damage or inconvenience to appellee and all others, and only did such acts as were proper and necessary to be done in the use of said waters for the purposes aforesaid; that after erecting said bath house appellants placed under ground a drain made of porous tile to convey the surplus water from said artesian well under ground to the branch above appellee's land, because said branch was the only natural and only convenient outlet for said water.

It would seem, therefore, that all due care has been exercised in the premises, and that the business is lawful, and that it is conducted in a lawful manner.

It is a question, also, whether appellee, having stood by and assented to and acquiesced in the expenditure of said sum of ten thousand dollars in the erection of said bath house, is not now estopped from seeking to enjoin the continuation of its use.   For over a year before this, she had also acquiesced in the flowing of the artesian water into the stream, and now she could hardly be ignorant of the purpose for which the sanitarium was to be used.

This court has held that under certain circumstances, by remaining silent and allowing acts to be done and expense to be incurred, persons may lose their remedy by injunction, and be compelled to assert their rights at law. *City of Logansport* v. *Uhl, supra,* and authorities there cited.

In New Jersey it was held that if a person "has given his consent, either expressly or impliedly, to the erection of expensive works, he can not afterwards enjoin their operation, though they prove more annoying or injurious than he anticipated." *Hulme* v. *Shreve,* 4 N. J. Eq. 116.

We think the facts stated in the second paragraph of the answer sufficient.

The judgment is reversed, with instructions to overrule the demurrer to the second paragraph of the answer, and for further proceedings not inconsistent with this opinion.

Filed June 6, 1893.

### On Petition for a Rehearing.

Howard, J.—Counsel for appellee earnestly refer us to the provisions of the statute, section 658, R. S. 1881,

forbidding the reversal of a judgment when it shall appear to the court that the merits of the case have been fairly tried and determined, and contend that the judgment in this case should be allowed to stand and so prevent further litigation.

If, indeed, it should appear to the court that the merits of this case had been fairly tried and determined, it would be our duty to affirm the judgment, but the trial court having sustained a demurrer to the affirmative matter set up in the answer, we are left unable to say whether appellants were harmed by the rulings. It is only when the allegations of a proper paragraph of pleading may be established by proof under other paragraphs that the sustaining of a demurrer to the paragraph in question will be held harmless. By its ruling on the demurrer, in this instance, the court has said that the facts stated in the answer, even if true, would not constitute a good defense to the action. Under this ruling, also, the affirmative paragraph of the answer was, in effect, stricken out, and the appellants had no right to offer proof to sustain its allegations. "Nor," as said in *Wilson* v. *Town of Monticello*, 85 Ind. 10, "would it be just to a defendant, who has put in a valid plea, to hunt through the evidence to ascertain whether he was or was not injured, for he is entitled to the benefit of the explicit admission made by the demurrer." See, also, *Pennsylvania Co.* v. *Poor*, 103 Ind. 553; *Fleetwood* v. *Brown*, 109 Ind. 567; *Rush* v. *Thompson*, 112 Ind. 158.

Counsel intimate further that it could be shown that the allegations made in the answer are not, in fact, true, and that appellants could have obtained an outlet by constructing a drain to another stream, and so have avoided injury to appellee.

In answer to this, "It may be asked," as said in *Pennsylvania Coal Co.* v. *Sanderson, supra,* "where, short

However that may be, appellee is in no condition to make such contention against the answer. If the averments of the answer were believed to be untrue, they should have been replied to, and the truth of the matter alleged be thus put in issue and determined. *Gilmore* v. *McClure, Admr.*, 133 Ind. 571, 33 N. E. Rep. 351.

Instead of this, however, appellee chose to demur to the answer, and thus to admit the truth of the facts therein pleaded. The facts alleged being thus admitted, the appellants ought to have judgment.

We do not wish to be understood as holding that appellants were authorized, by artificial means, to conduct the waters from their spring into the stream upon appellee's land, unless the said waters would have naturally flowed into said stream without such artificial aid; and it was upon this interpretation of the answer that the opinion was written.

The petition for a rehearing is overruled.

