BARNARD ET AL. *v.* SHIRLEY.

[No. 18,103. Filed Sept. 22, 1897. Rehearing denied July 1, 1898.]

SPECIAL FINDINGS.—*Damages.*—*Waters and Water Courses.*—Where the special findings in an action for damages on account of the pollution by sewage from a sanatarium of a spring branch running through the lands of plaintiff contain statements to the effect that the water in such stream after receiving the sewage was comparatively harmless, and that plaintiff had been able to sell her lands at a price equal to that received for lands of a similar character in other portions of the city in which plaintiff's lands were situated, neutralize the statement in the finding that she was damaged. *pp. 161-173.*

Barnard *et al. v.* Shirley.

DAMAGES.—*Damnum Absque Injuria.—Waters and Water Courses.*—
Where the owner of a sanatarium allows water from an artesian
well which has been used in such sanatarium for bathing to flow
into a stream running through the lands of an adjoining landowner
the damage sustained thereby by such landowner is *damnum
absque injuria* where such stream was the only natural and avail-
able outlet. *pp. 173, 174.*

From the Morgan Circuit Court. *Reversed.*

*W. R. Harrison, Oscar Matthews* and *Willis Hick-
am,* for appellants.

*John C. Robinson, M. H. Parks* and *W. S. Shirley,*
for appellee.

McCABE, C. J.—The appellee sued the appellants to
recover damages for, and to restrain them from caus-
ing certain mineral water coming from defendants'
well to flow through a certain spring branch adjoining
plaintiff's land, by which the waters of said branch
are befouled to the plaintiff's injury. The issues made
were tried by the court, resulting in a finding and
judgment against the defendants, according to the
prayer of the complaint. That judgment was, on ap-
peal to this court, reversed for error in sustaining a
demurrer to the second paragraph of defendants' an-
swer. *Barnard* v. *Shirley,* 135 Ind. 547, 24 L. R. A. 568.
On the return of the case to the circuit court the issues
were again tried, resulting in a special finding of the
facts, upon which the court stated its conclusions of
law, upon which it rendered judgment in favor of the
plaintiff, both for damages and enjoining the defend-
ants, as prayed for in the complaint.

The substance of the special finding by the court is:
That the land described in the complaint, situate ad-
joining the city of Martinsville, was purchased by
plaintiff from Lafayette Sims on May 10, 1886, and
plaintiff has ever since held and possessed the same.

That said Sims owned and occupied said lands for years before; that said defendant, Elizabeth Barnard, has owned the lots described in the complaint, numbers twenty and thirty, in the original plat of the town of Martinsville, Morgan county, Indiana, since the year 1868, and still owns the same; that, at the time of selling and delivering to plaintiff the lands above described, said Sims also sold and delivered to her 160 acres lying about one mile to the northeast of said first described land, and other lands adjacent to said lands first described and lying west thereof; that said 160 acres is a hill tract, and from the foot of the hills near the southwest corner of the tract there puts forth a spring of pure water, suitable for any use, and which, flowing in a southwesterly course, unites its waters with those of several others of equally pure water, and one of which is of greater volume than plaintiff's spring, and the waters of these various springs combined, would, if combined at their head, fill a four-inch pipe with pure spring water, with continuous flow; that prior to 1870 the waters of this branch flowed as they do now—south and west of south one-fourth of a mile or over, thence west to the east border of the original plat of the town of Martinsville, thence south on the border to and across Washington street, which passes the west side of the court-house square, in the center of the city, where, in times of heavy rains and freshets, it broke the banks of the ditches dug for it, and the levees made from time to time to confine its waters, and flowed over and inundated a large part of said city, and the southeastern part thereof, and formed large ponds of water, until they sunk or evaporated; that two tanyards were operated near by, and obtained their water from said branch up to 1870, and put their wastage into it; that in 1870 the town corporation of Martinsville

Barnard *et al. v.* Shirley.

changed the course and channel of said branch, from its intersection with Pike street in said town, and turned it west to a point due west of the west boundary of the original plat thereof, and a distance of over half a mile, thence south and southwest, onto the said lands first above described, then owned and occupied by said Lafayette Sims, and now owned by plaintiff; that said Sims was consulted in relation thereto by the authorities, and consented to said change of the channel of said stream, and the flowing of the waters thereof upon his said lands that he might have the use of the same for stock water, for which it was suitable; that ever since said change was made the waters of said branch have continued to flow onto the lands so purchased by plaintiff from said Sims; that before said change was made, and before the channel of said branch was cut down on the south side of Pike street, in times of big rains and freshets, the waters of the branch would break out of its channel and flow over Pike street, and form large pools of water in various places in the central parts of said city; that said branch, since the change down said Pike street, flows the distance of about one-half mile through said city, near three-fourths. of its distance being through a part of the city of population and improvement about equal to any other part of said city.

Until within eighteen months past a large tanyard was maintained and operated on Pike street, on the south side thereof, at the point of the turn of said branch west on Pike street, and obtained its water from said branch, and emptied into said branch the refuse from its vats in large quantities at weekly intervals, and which was of such offensive character, and produced such an offensive odor, as that persons residing in the vicinity were compelled to close their windows to keep out the stench; and, in connection

with this mass of filth, the waters of the branch, usually accumulated by a temporary dam, would be turned, and the mass distributed throughout the channel of the branch below, the effects and stain of which would remain for a considerable time; that Martinsville, either as a town or city, has never had other than open ditches, no underground sewers, and the said branch on the south side of Pike street is, and has been since it was opened in 1870, the principal drainage for all that part of the town and city lying north of it, and east of the central part of the city, and in it has been found, and from it has been taken, from time to time, dead animals, such as hogs, dogs, cats, chickens, etc., in all stages of decay.

Said branch is the only living stream passing or that ever has passed through said town or city. In times of heavy rains and freshets, the surface washing and water from near one-third part of said city, and from pasture hills lying north of it, from cross streets and alleys, flow into said branch on said Pike street, carrying into the same the washings from stables and other outbuildings; that some of the persons residing along said branch throw their soapsuds from clothes washings, and kitchen slops into the same, with other kitchen refuse, including the entrails of chickens; that at the present time there is one or more dead animals in said branch, and there is flowing into it, about 600 feet above where the tile drain from defendants' sanatarium flows into said branch, a tile drain from the Martinsville Sanatarium, which has been connected with said ditch since this suit was originally filed; that there is now, and long has been, a city ordinance of said city prohibiting anyone from throwing dead animals or any refuse or befouling substance in said branch, and from in any way befouling the same.

Barnard *et al.* *v.* Shirley.

The Martinsville Sanatarium has been in operation for three years, and bathes as many patients as are bathed at defendants', and all the water from said baths enter through said tile into said branch on Pike street, and above where the drainage from defendants' sanatarium enters the ditch, and no distinction is made at said Martinsville Sanatarium as to baths given syphilitic patients and others, but the waters from all baths enter said branch together, the distance from the bath house to said branch being about eighty feet. The waters and soapsuds from a laundry erected since this suit was commenced, and conducted and operated about 100 feet from said branch, when of any considerable quantity, as they often are, flow into said branch through a covered ditch on Morgan street, one square south of Pike street; that all the water from any source which enters the Pike street ditch flows to and beyond the west boundary of said original plat of the town of Martinsville with considerable current, and from that point south across the mill lot of Moran, one square, to Morgan street, in said city, thence across Morgan street, in the same direction, some sixty feet, thence still south through the residence lot and cow pasture of one Hastings, to a point on a line with the north line of Washington street extended, thence still south under a culvert or small bridge on a passway of some sixteen feet or more leading to extensive bottoms to the west, and used by many persons.

That said branch from said culvert angled some to the west of south, through and across the said lands of plaintiff, and then entered the land of Harvey Satterwhite, and there flowed more westerly, and, prior to the state ditch hereinafter mentioned, caused several considerable ponds on the lands of Satterwhite and plaintiff, lying west of the tract crossed by the

branch, and which ponds continued and were stag-
nant, having no outlet, during a large part of each
year, until drained off by said state ditch; that other
ponds between Morgan and Washington streets, and
near the line dividing the lands of plaintiff and Sat-
terwhite, existed, of considerable size, at the time said
branch was cut and the waters turned down Pike
street, but the same were filled by washings and de-
posits from said branch; that the said state ditch, so
recently cut as aforesaid, follows the line, in the main,
of the said branch from its intersection with the Pike
street ditch south of the Satterwhite line; that before
the state ditch was cut there was at times a consider-
able flowage and accumulation of water upon plain-
tiff's said land from the surface ditches on the streets
of said city, and, there being no well-defined channel
for said waters across plaintiff's said land, plaintiff
caused a ditch of small dimensions to be cut for said
branch and street flowage across said land, on or
near the line of said branch, at a cost of $20, $10 of
which plaintiff demanded said city should pay, and
said city did pay the same, because of the benefit
thereof to the city. That the waters of White river
during considerable freshets flow through a natural
depression in the ground, the surface on either side
rising gradually to a height of from two to five feet
within a distance of from 500 to 600 feet of the chan-
nel of said branch before the cutting of said state
ditch or other ditches from its start west on Pike
street.

Prior to the commencement of the alleged wrong-
ful acts of the defendants, the water flowing in said
branch and through plaintiff's land, while not pure,
was reasonably fit and valuable for farm and stock
purposes, and the only stream of water accessible for
stock kept and pastured on plaintiff's land, and was

used for that purpose by the plaintiff during the part of the season that it reached her land. The land of plaintiff south of Washington street is pasture land, and valuable for grazing purposes, and, by reason of its location, valuable for cow pasture. Prior to the acts of defendants complained of, the waters of said branch deposited no offensive matter on the lands of plaintiff, except such as would naturally find its way into an open public ditch or branch running through a thickly populated district—no offensive or unhealthful odors, or anything unsightly or damaging to plaintiff's lands, except such as would naturally arise from decaying vegetation, refuse and decaying matter, thrown and finding its way into an open ditch, situated as this ditch was.

A large part of plaintiff's said lands are within the corporate limits of said city, and are valuable for building purposes, suitable to be platted into town lots, and, if not injured or damaged by any nuisance, they would find reasonably ready sale and demand for such purposes. The flow of water from said springs in said ditch or branch through plaintiff's land, is irregular in quantity, and intermittent in continuity. They almost entirely disappear before reaching the point where the tile drain intercepts them. In midsummer and dry seasons of the year the waters do not ordinarily reach the plaintiff's land lying below the mouth of the tile drain. During the winter and spring months, and parts of the year other than dry seasons, the waters flow into the lands south of Washington street, and part of the time through the land of plaintiff. For the larger part of the time when said waters reach the lands of plaintiff below the mouth of the tile drain, their flow does not continue during the whole day, but during portions of each day. In dry weather they sink and disappear before

reaching said tile ditch. That defendants' said lots
at the surface are dry, and up to the time of the dig-
ging of the artesian well hereinafter set forth, had no
water thereon save surface water from rains and melt-
ing snows and other surface water that flowed over
the same from adjacent lots and streets, and on rare
occasions, such as the floods of 1847 and 1875, the
waters of White river passed over and flooded the
same, and that prior to the sinking of the well on de-
fendants' land, and bringing the water to the surface,
such mineral water had not, by percolation or other-
wise, flowed into said branch, or upon or over plain-
tiff's land in question. That in the summer of 1888 a
company of citizens of Martinsville bored for gas, coal,
or other minerals on said lots of defendants, which
constitute a single inclosure and plat of ground, with
the permission of the defendants. The bore was 1,700
feet deep and over without finding gas in paying
quantities, coal, or other mineral, but at a depth of
near 700 feet struck a strong vein or flow of mineral
artesian water, and which when confined to a six-inch
pipe, rose to a height of thirty feet above the ground
surface, and flowed therefrom with great force; that
said bore and well were practically abandoned by said
company after the failure to find gas or mineral, the
water flowing therefrom in large quantities and wast-
ing for the space of one year; that the water was ana-
lyzed, and found to possess medicinal and curative
properties and ingredients, and thereupon the defend-
ants concluded to utilize the same for the general
benefit, as well as the benefit of the defendants; and,
to that end, defendants purchased a large part and
controlling interest in the stock of said company, and
proceeded at once to erect and operate a bath house,
with the necessary bath tubs, engines, boilers, and
plumbing. That such was the effect of drinking the

waters of said well, hot or cold, and bathing in the same, in restoring and giving relief to the afflicted, during its first year of operation, that during the ensuing season the bath house was enlarged, larger boiler and engine procured, number of tubs increased, and facilities for baths to suit all maladies, added, so that 500 baths each day can be taken; that these improvements, under the strictest economy consistent with the procurement of good work and material, have cost in excess of $10,000; that the great relief and permanent cures of many hundreds of persons and patients from all parts of Indiana, and adjoining and more distant states, of rheumatic affections, neuralgia, kidney affections, all manner of eruptions, and other skin diseases, indigestion, and other stomach troubles, ulcerous affections, spinal diseases, and everything resulting from impurity of blood, dropsy, malarial and syphilitic affections attest the medicinal value of said waters, when properly used; that the number of persons affected by the above-named diseases that have been and are bathed at said sanatarium average from fifty to 500 per day during the spring, summer and fall seasons; that there is required and used about one barrel of water for each of said baths. That the net receipts of defendants from operating said sanatarium, from renting the same, are of the value of $150 per month. A public fountain is kept flowing and in order for the use and benefit of the public, and this is used continuously, day and night, by all the citizens of Martinsville, or nearly so, at their pleasure, and by hundreds of passers by on trains or in private conveyances, free of cost; that in constructing said bath house and providing the necessary drainage therefrom, defendants laid a tile ditch of four-inch tile from said bath house, in a southwest direction,

across the said lots and pasture of said Hastings, to said branch, from two to four feet under the surface; that all syphilitic patients who are treated at said sanatarium who have any eruptions are now, and have been since the former trial and judgment, confined to the use of a special room and tub, and the waters from said tub are, and have been since said date, so piped as that they cannot enter said tile, or flow to said branch, but enter the privy sink which is cleansed as often as each three months; that said tile is of the usual clay and porous character, and is laid part of the way through sandy and gravelly soil; that said water and the ingredients of it contain well-known germicides, to which properties its curative qualities are attributable mainly; that said waters are healthful, and in the natural state good for live stock of all kinds, and such stock will use no other after using it, if they get to it; that said water when exposed to the air, both before and after being used in baths, yields a considerable quantity of white and sometimes jellied white sulphur, and magnesia, or other substance which gathers about grass, weeds, or trash, and which give the channel of the ditch an unclean, slimy and repulsive appearance near and about the point where said tile drain enters the ditch, and extending not exceeding thirty or forty feet from the mouth of said tile drain, but is in no way poisonous or injurious to live stock or human beings; and said water after being used in ordinary baths as used in defendants' bath house, and flowed through said tile drain to said branch, is not poisonous, or necessarily injurious to live stock; that said waters of said well are strongly impregnated with sulphureted hydrogen gas, which gives a strong sulphureous odor at said well, at the public fountain, in the baths, and at the end of said tile where the same enters the branch, which odor is

Barnard *et al.* *v.* Shirley.

not unhealthful, but is strong and offensive to the senses, and sometimes becomes very offensive to persons living in the vicinity of said tile drain where it enters the said ditch; that said waters, after passing through said tile and parting with the white sulphur, magnesia, etc., as above described, if mixed with the sand and clay of the soil for some time, forms a black mud, greasy, and filthy in appearance, strongly impregnated with sulphur,—sometimes in cases of acute pains, used in mud baths with much success—which mud when stirred up, gives out a strong sulphureous odor very unpleasant to the senses, but has nothing necessarily unhealthy about it. Such black appearance only extends for a short distance below the mouth of the tile. That in the year 1893, in pursuance of a petition by defendants and others, and particularly at the instance of the city authorities of said city, such proceedings were had in the circuit court of Morgan county, that a public ditch under the drainage laws of Indiana, was established, beginning north of where the Pike street ditch intersects said branch, and following the course of said branch to the line between plaintiff and Satterwhite, and thence to the White river, to the depth of two feet and more, the plaintiff being made a party thereto and assessed to aid in constructing the same.

That defendants were assessed and paid benefits arising to their said lots by said ditch to the amount of $132.50, presumably because of their drainage thereto from their sanatarium aforesaid, and when said ditch was completed they were apportioned 500 feet of said ditch, to be by them kept in repair; that said city was assessed and paid benefits arising from the drainage of a half dozen of her streets by said ditch the sum of $500, and was apportioned 1,000 feet thereof to be kept in repair by said city; that defend-

ants, because of plaintiff's objection, attempted to run said waters into a sink dug on their said lot down through the soil, twelve feet square, to the gravel underbed, but the same failed to carry off or sink said water; that defendants' said lots do not at any place reach said branch and ditch, and are not nearer thereto than 300 feet; that within the last year plaintiff has sold to one Shireman nine lots, 66 by 132 feet, at $100 to $125 per lot, bordering on said branch, and said Shireman has erected two, and is engaged in erecting and building a third dwelling house thereon, one of which is within ten feet and over the mouth of defendants' tile drain, where it enters said branch; and also sold two lots near the same place, at $150 each, to a Mr. Reed, who has also erected thereon a commodious dwelling, all of said houses are and have been for some time occupied by families; also sold one Hubbard other lots in the same vicinity at $150 each; that similar lots at other points about the city can be bought for the same or lower prices, equally as well situated, and surrounded with facilities for residences, and no complaint is made of any inconvenience on account of said waters by any of the purchasers of said lots; that the only other available drainage for said sanatarium waters would be a sewer to White river, one mile distant, and which could not, with any hope of success, be constructed and put in operation for less than $3,500 to $4,000, to which would have to be added the cost of the right of way, which right of way the owners of said land refuse to grant; that the waters flowing from said sanatarium when baths were being taken to the usual extent and amount were found to be purer, and to be possessed of less organic and injurious matter, than the waters of said branch taken from above, and unaffected by said bath house flowage. The flowage of

Barnard *et al. v.* Shirley.

said waters in said branch as aforesaid rendered the lands of plaintiff in the immediate vicinity somewhat less desirable for residence, and somewhat injuriously affected the value of their use and occupation. The plaintiff, believing said water impure and unfit for stock to'drink, erected a fence upon her land to shut her stock off from said waters, at a small cost, and was in consequence deprived of the use of the portion of said tract lying south of the ditch for pasturage purposes, to her damage in the sum of $50.

The conclusions of law stated on these facts are that the law is with the plaintiff; that she is entitled to an order and judgment restraining and enjoining the defendants from causing or permitting the water from their bath house which shall have been used in bathing and cleansing persons afflicted with infectious, syphilitic, or other similar disorders to flow, by means of a tile drain, or otherwise, into the branch or stream in question, or upon or over the lands of the plaintiff, and that she be entitled to recover the sum of $50 as her damages.

The principles laid down, exemplified, and elucidated in the opinion when this case was in this court before, more than warrant us in adjudging that the court erred in its conclusions of law. We need not repeat what was then said, but refer to it as the law of this case. The finding seems somewhat contradictory as to whether appellee has suffered any injury whatever, and therefore it is self-destructive as to that matter. At all events, the statement of the harmlessness of the waters, and the price that appellee has been able to sell her lands for as compared with other land similar in character in said city, neutralizes the statement that she is damaged; but, if she was damaged, as held in the former opinion, it is *damnum absque injuria,* because the rightful use of one's own

land may cause damage to another without any legal wrong. The judgment is reversed, with instructions to restate the conclusions of law in favor of the defendants, and render judgment for the defendants thereon.

Jordan, J., was absent, and took no part in this opinion.