City of Richmond *v.* Test *et al.*

---

CITY OF RICHMOND *v.* TEST ET AL.

[No. 2,271. Filed November 24, 1897.]

MUNICIPAL CORPORATIONS.—*Sewers.*—*Liability to Riparian Owner for Pollution of Stream.*—A municipal corportion which has constructed a system of sewers upon the best modern plan for conducting and discharging sewage and drainage, and has discharged the the same into a natural water course, which is the natural drainage of the land on which the city is situated, and has made the sewers to conform to the natural drainage, and constructed them substantially upon the lines of natural drainage and water courses which had previously carried the surface drainage, is not liable in damages to a lower riparian owner by reason of polluting the water with such sewage.

From the Wayne Circuit Court. *Reversed.*

*A. C. Lindemuth* and *John L. Rupe*, for appellant.

*W. A. Bond* and *H. C. Fox*, for appellees.

ROBINSON, C. J.—Appellees brought this action to recover damages for the alleged pollution of a natural water course by the discharge of sewage into said stream by the appellant.

The controlling question in this case is, has a municipal corporation the right to construct sewers, and through them discharge sewage into a natural water course, and thus pollute the water so as to render it unfit for use by those who have a right to use it, and had such right prior to the time of such pollution?

The special verdict shows that in 1865 the appellees became the owners of a certain woolen factory, situated near Whitewater river, a natural water course, and about one mile south of the city of Richmond, and that continuously since that time they have been in the possession of said factory; that the machinery of their factory is propelled by water taken from the river about 330 feet below the south line of the city, at which place appellees have maintained a dam across the river to direct the water into a race about three-fourths of a mile long, that connects with their factory, in which they have a large amount of valuable machinery used in manufacturing merchandise for sale; about the year 1882 or 1883 the city constructed the North E street sewer, which discharges its contents into the river about 10,000 feet above appellee's dam, and discharges about 281,923 gallons of sewage every twenty-four hours; also, in 1882 the North Sixteenth street sewer, which discharges its contents into the river about 17,000 feet above the dam, consisting of about 79,920 gallons of sewage every twenty-four hours; and in 1883 the Cascade

sewer, which empties into the river about 2,300 feet above the dam, and discharges about 519,000 gallons of sewage every twenty-four hours; the North Sixteenth street sewer is a drain sewer discharging drainage and storm water, and into which no sewage has ever been conducted or discharged; all the sewers are permanent structures, and cost in excess of $124,000.00; the appellees never consented to the discharge of the sewers into the river; that two of these sewers received the contents of privy vaults, urinals, waste-water, and other foul and polluting substances from dwellings and other houses in the city, and that prior to the construction of the sewers these polluting substances were not discharged into the river; that since the sewers were constructed the bottom of the river and of the race have been thickly covered with a black accumulation, which discolors the water and gives forth foul and offensive odors, which did not exist prior to the construction of the sewers; that appellees used in their business a great quantity of water, which it was necessary to take directly from the race to wash and cleanse wool to prepare it for manufacturing; the factory site was first improved, and the water power used about the year 1832, and has been used as such continuously since, and at that time the city was a small village with about seven hundred inhabitants; that the city now has about 20,000 inhabitants; that the river flows through the city from the northeast corner, in a general southwesterly course; that the banks of the river are about 100 feet above the water, about 600 feet across the top of the bluffs, that the river flows over a bed of shale rock; the natural formation of the ground on which the city is built is such that the natural drainage is towards and into the river; along the eastern and northeastern sides of the city and extending around to the river,

bluffs on the south is a ridge, or elevation of ground considerably higher than the city, which makes the natural water shed and drainage over the ground upon which the city is built toward and into the river; the east fork of the river flows into the middle fork within the corporate limits of the city, and into the west fork within the city limits; that the sewers are constructed substantially upon the line of natural drainage and water courses which had previously carried away the surface drainage and waste; that they were constructed upon the best modern plans for conducting and discharging sewage, and as a proper means of drainage for the preservation of public health; the city has claimed and exercised the right to construct such drains and sewers as might be necessary, and discharge the same into the river for twenty years; the Cascade sewer, which is farthest south, empties into the river about 800 feet north of the point to which the backwater of the dam extends; the nearest water closet connection and the nearest house connection with the cascade sewer, is about 3,500 feet from the mouth of the sewer; the sewage is largely diluted with water in solution before it reaches the mouth of the sewers; all garbage of the city is excluded from the sewer; during the summer months of 1893 it was necessary to turn all the water in the river in the race to propel appellees' machinery, except when the river was flushed with high water; the offensive odors from the polluted water extended into appellees' buildings and essentially interfered with their business; that the city had knowledge of the offensive nature of the sewage discharged from the sewers; nothing was ever done by the city to deodorize the sewage; that the sewage of the city would not be discharged into the river were it not for the sewers; that the foul, filthy, and polluted condition of the water

was in a great. measure produced by sewage dis-
charged from the sewers; prior to the construction of
the sewers appellees suffered no material inconven-
ience by reason of the condition of the water, in wash-
ing and cleansing their wool in preparing it for manu-
facturing purposes; none of the sewers are discharged
nearer than 800 feet from appellees' premises; that
the sewage so accumlates at the dam and gates as to
cause the water to stand and stagnate at times of low
water; that there would be no accumulation but for
the dam and gates of appellees; the accumulation of
sewage at appellees' head gates and race would not
collect and cause any offensiveness or injury, except
for the obstruction of the flow of the water in the
stream by the dam and gates placed there by appel-
lees; that for a long time prior to the bringing of this
suit, the refuse and waste from a large tannery on the
river bank were discharged into the river; that the
waste discharged into the river from a paper mill, and
from the Gaar, Scott & Company's manufactory, em-
ploying 500 to 700 hands, polluted the water in the
river; that the washings, waste, and matter finding
its way into the river within the city from dumps
used by citizens to discharge decaying animal and
vegetable matter, polluted the water in the river; also
the waste matter from gas works; also the sewage
from the county sewer from the court house and
county jail and connection, polluted the water; also
from the piano works; the refuse from three slaughter
houses was for the past six years discharged into the
river, which polluted the water; that for the last six
years the sewage from the slaughter houses and from
the gas works has been less than in former years; that
in cleansing wool it is necessary that the water be as
free from pollution as possible; that at the time ap-
pellees erected the buildings they now use the condi-

tion of the water in the river was suitable for the pur-
poses for which they used it; since the construction
of the sewers there has been a gradual increase in the
number of persons using the same for sewage; that in
1888 or 1890 the sewage first began to materially in-
terfere with appellees' use of their factory; that when
this suit was brought the water was not in proper con-
dition to use in cleansing wool, because of the sewage
from the city's sewers; that the slaughter houses, gas
works, and other manufacturing establishments above
mentioned have been in continuous operation for at
least twenty-five years, and that these would not, of
themselves, have polluted the water so as to materi-
ally interfere with appellee's use of their factory;
that if the sewage had not been discharged into the
river from the sewers the annual rental value of ap-
pellees' property was $1,200.00, and with such sewage
in the river the annual rental value was $300.00; that
appellees have been damaged in the sum of $1,350.00;
that if the river had not been polluted by the sewage
from the city sewers, appellees' property would be
worth $20,000; that with the polluted river from the
city sewers, it was worth $7,000; that for several years
the pollution of the water has been caused in part
by the sewage from the city sewers; that it is not pos-
sible to determine from the evidence whether the pol-
lution of the water was caused by the gas works,
slaughter houses, or the appellant's sewers; the oil
and grease in the water at the dam and race was
caused mainly by waste from the slaughter houses
and oil from the gas works; there was no material in-
terference with appellees' business from polluted
water prior to 1890; this interference is largely influ-
enced by the stage or volume of water in the river; it
is not possible to determine from the evidence the ex-
tent of any pollution arising from the paper mills,

Gaar, Scott & Company's factory, the gas works, the county sewer, the slaughter houses, dumps along the river banks and surface drainage; that for the past four or five years there have been extraordinary seasons of drouth, and that the water in the river has been extraordinarily low, and that interference with appellees' business by pollution of the water is largely influenced by the volume of water in the river, and that there is no substantial injury at ordinary stages of water and ordinary seasons of rainfall; that the volume of water flowing in the river in 1893, and prior thereto, was from nineteen million to twenty-three million gallons in twenty-four hours; that a natural water course will take up and disperse an amount of sewage flowing into it equal to five per cent. of the volume of water in the stream without material pollution of the stream; that the flow from the city sewers into the river was about two and a half per cent. of the water then flowing in the stream; there was not a sufficient volume of water in the river at all common and ordinary stages thereof to dilute and disperse all sewage matter from the city sewers so as to render the same substantially harmless in the absence of pollution from any other source; that in 1891, appellees sold to the Richmond City Water Works Company for $1,500.00 the right to take all the water from the east fork of the river if the company should desire it, and that the east fork furnished one-half or more of the volume of water which flowed in the stream in and through appellee's dam and race. Interrogatory 189: "If you find from the evidence, that the plaintiffs, prior to the bringing of this suit, have sustained, on account of the pollution of the water complained of, by the defendant alone, in redyeing their wool or yarn, state in answer to this interrogatory in what amount they have been damaged on account of such redyeing?" Ans.

"Two hundred dollars." Interrogatory 190: "If you find from the evidence that the plaintiffs have sustained damage prior to the bringing of this action, by reason of any pollution of the water of the river by defendant alone, in necessarily cleansing their race and dam on account thereof, state in answer to this interrogatory in what amount they have been so damaged in this particular." Ans. "Seventy-five dollars." Interrogatory 191: "If you find from the evidence that the plaintiffs, prior to the bringing of this action, sustained any damage to their business on account of the pollution of the water complained of by the defendant alone, other than the damage on account of redyeing their wool or yarn and the cleansing of their race and dam, state in answer to this interrogatory what any such other damages are, and the amount thereof." Ans. "None."

Appellant's counsel first discuss the refusal of the court to require appellees to make their complaint more definite and certain, claiming that the complaint does not show whether a recovery is sought for damages to their business from a continuing nuisance, or whether for damages past and prospective for a permanent injury to the freehold.

It appears from the complaint that appellees are the owners of certain real estate bordering on Whitewater river, a natural water course, and located on said real estate is a factory, in which they manufacture woolen yarn; that their factory is situated on the bank of said river, about one mile south of the city of Richmond; that the machinery of their factory is propelled by water taken from said river, by means of a race; that appellees and their grantors have owned the real estate and said water privileges for fifty years; that in manufacturing yarns and other material, they are required to and do use large quantities

City of Richmond *v.* Test *et al.*

of water taken from said river; that appellant has for the last eight years, without the consent and over the protest and objection of appellees, polluted and contaminated the waters of said river by constructing a number of sewers and discharge therefrom polluting substances from privy vaults and other sources in said city into said river, which would not otherwise have been discharged therein; that the water, after being so polluted, passes down to appellees' factory, but that by reason of such pollution it is unfit for the uses of appellees; that by reason of such discharge of polluted water, appellees have suffered great detriment and damage in said business and depreciated value of their property, which has been caused thereby, and has been rendered practically worthless and of but little, if any value; that by reason of the acts of appellant the appellees were damaged.

It is true, it is specifically alleged that the appellees are injured by reason of the offensive odors, and also because of the polluted water being unfit for the purposes of washing wool and running the factory. But it also appears that the factory would be practically worthless if appellees were deprived of the use of the water in the river. The factory is valuable only by reason of what it can manufacture, and if its output is materially and permanently decreased, the property has suffered accordingly as to its value. Taking the complaint as a whole, we think it seeks to recover damages because of certain alleged acts of appellant, and by reason of which appellees' property has been rendered less valuable.

The sufficiency of the complaint presents a more difficult question. Is a municipal corporation which has constructed a system of sewers upon the best modern plan for conducting and discharging sewage and drainage, and has discharged the same into a

natural water course which is the natural drainage of the land on which the city is situated, and has made the sewers to conform to the natural drainage, and constructed them substantially upon the lines of natural drainage and water courses which had previously carried the surface drainage, liable in damages to a lower riparian owner by reason of polluting the water with such sewage?

It is alleged in the first paragraph of answer that the appellant is a city with a population of 20,000 or more; that the ground on which it is built is on a general level, about seventy-five feet above the water in said stream, which flows on and along the northern, western, and southwestern borders thereof, and thence in a southerly direction past the premises of appellees; that the natural drainage of the ground is and always has been towards and into said stream, and owing to the conformation of the sourrounding country it has been and is impossible to have drainage in any other direction, and no drains or sewers for such purpose could or can be made without having their outlet into said stream; that it became necessary to construct sewers in said city, and that the city for more than twenty years had claimed and exercised the right to construct such sewers as were necessary, that said sewers were constructed on the most approved and scientific methods, and has used due and proper care to avoid inconvenience and damage to individuals or the public, and in maintaining the same has made all regulations and taken all precautions to make the use of the same of the greatest utility and least injury; that the quantity of water flowing through said sewers is sufficient in volume to dissolve and disperse all solid and filthy matter conveyed into said sewers; that it is impossible, without enormous and unreasonable expense, to provide any means for

the further purification of such sewage; that all of said sewers were constructed and put into use more than eight years before the beginning of this action, and have been constantly in use during that time; that the same were constructed under the laws of the State at a cost to exceed $200,000.00; that appellees knew that said sewers were being constructed, but at no time made any protest or objection thereto; that none of said sewers discharge their contents upon appellees'· premises; that between the outlet of said sewers and appellees' premises there are divers slaughter houses that have been there located for many years before and since the construction of said sewers, and which discharge all their refuse into said stream; that above appellees' premises, before and since the construction of said sewers, are tanneries, paper mills, gas works, and other manufactories, discharging filth into said stream; that the pollution of said water is caused by the dam maintained by appellees, which in times of low water causes the water to become stagnant, and large quantities of vegetable growths growing in and upon the bottom and sides of said stream become detached therefrom and rise and float upon the surface, and the same, with the offal impurities aforesaid, being detained by said dam, produce the injuries complained of, none of which would occur but for the obstructions of the water, as aforesaid. .

The second paragraph of answer is substantially the same as the first, with the additional averments that the injuries complained of were caused by appellees' dam, and that the same could have been readily prevented by the exercise of reasonable and ordinary care and diligence on the part of appellees, such as it was their duty to use under the circumstances; that appellees, for the purpose of washing wool, negli-

gently drew the water so contaminated directly from their head race without using any means to strain or purify the same, which could readily have been done by the exercise of proper care and diligence.

The fourth paragraph was the general denial; the fifth paragraph pleaded the six years' statute of limitation to so much of the complaint as claimed damages for permanent injury to appellees' property; and the sixth paragraph, that for more than twenty years appellant had claimed and exercised the right to construct sewers and discharge sewage into the river above appellees' dam and factory, which right appellees knew and never denied or disputed.

A riparian proprietor has no property in the water itself, but only a right to use it as it flows by or through his premises, and if he diverts the stream he must return it to its natural channel when it leaves his estate. *Dilling* v. *Murray*, 6 Ind. 324, 63 Am. Dec. 385; *Tillotson* v. *Smith*, 32 N. H. 90, 64 Am. Dec. 355; *Wheatley* v. *Chrisman*, 24 Pa. St. 298, 64 Am. Dec. 657; *Burwell* v. *Hobson*, 12 Grat. 322, 65 Am. Dec. 247; *Stein* v. *Burden*, 29 Ala. 127, 65 Am. Dec. 394; *Davis* v. *Getchell*, 50 Me. 602, 79 Am. Dec. 636, and note.

The principle is well settled, that in the absence of grant, license, or prescription limiting his rights, a riparian proprietor has the right to have the waters of a natural water course flow along or through his premises as it would naturally flow, without change of quantity or quality. *McCalmont* v. *Whitaker*, 3 Rawle 84, 23 Am. Dec. 102; *Crooker* v. *Bragg*, 10 Wend. 260, 25 Am. Dec. 555; *Buddington* v. *Bradley*, 10 Conn. 213, 26 Am. Dec. 386; *Omelvany* v. *Jaggers*, 2 Hill (S. C.) 634, 27 Am. Dec. 417; *Evans* v. *Merriweather*, 3 Scam. 492, 38 Am. Dec. 106; *Wadsworth* v. *Tillotson*, 15 Conn. 366, 39 Am. Dec. 391; *Plumleigh* v. *Dawson*, 1 Gilman 544, 41 Am. Dec. 199; *Dumont* v.

*Kellogg,* 29 Mich. 420; *Bliss* v. *Kennedy,* 43 Ill. 67; *Acquackanonk Water Co.* v. *Watson,* 29 N. J. Eq. 366; *Pillsbury* v. *Moore,* 44 Me. 154.

In the case of *City of Valparaiso* v. *Moffitt,* 12 Ind. App. 250, suit was brought against the city for damages by reason of the pollution of a natural water course from sewage discharged therein by a system of sewers constructed by the city. The appellees were the owners of a tract of land through which the water ran, and in times of great rainfall the waters of the stream overflowed its banks and spread over appellees' land and caused cesspools of stagnant water, and deposited the filth and noxious matter from said sewers thereon, and that by reason of the noxious odors from the filth and waste matter, appellees' property was rendered unhealthy and depreciated both its rental and market value. The city relied upon an answer that prior to the bringing of the suit the appellees had sued the owner of certain gas works for polluting the stream by means of a sewer, and had compromised and settled the suit by accepting a certain sum in full satisfaction of all damages caused by such sewer. The real controversy in the case was the sufficiency of the city's answer, but the case holds that a municipal corporation is liable in a civil action for erecting and maintaining a nuisance the same as a natural person.

The record in the case at bar shows that other agencies contributed to the pollution of the water, but that fact does not excuse the act of appellant, if wrongful. It is always competent to show that some other person or persons may have contributed to the wrong, not for the purpose of defeating the action, but in mitigation of damages. The commission of a wrongful act is not excused by the fact that others have contributed to it.

It is argued by appellant's counsel that appellees have contributed to the accumulation of sewage complained of by maintaining the dam, and that it is within their power to prevent such accumulation. But ap-appellees have the right to use the water of the stream in any manner they see fit, so long as such use does not interfere with the rights of others. So long as their use of the water was a reasonable use they were exercising a legal right, and the question is whether they are deprived of that right by reason of the alleged wrongful acts of appellant.

The right to pollute the water of a stream may be acquired by adverse use for twenty years, but this would not be true if the pollution of the stream was such that it would be injurious to the public health, and the rule is subject to the further limitiaton that if the pollution is substantially increased, the prescriptive right is lost, as the use must continue and be the same as it was when the period of prescription commenced. It must appear that the injury results from artificial causes, and that there has been an actual increase of the pollution.

Appellant's counsel cite the case of *Pennsylvania Coal Co.* v. *Sanderson,* 113 Pa. St. 126, 57 Am. Rep. 445, 6 Atl. 453. That case was before the supreme court of Pennsylvania four different times. Upon the first three appeals it was decided that the plaintiff showed a right of recovery. *Sanderson* v. *Pennsylvania Coal Co.,* 86 Pa. St. 401; *Pennsylvania Coal Co.* v. *Sanderson,* 94 Pa. St. 302; *Sanderson* v. *Pennsylvania Coal Co.,* 102 Pa. St. 370. Upon the last appeal a contrary conclusion was reached. The action was brought by Sanderson against the coal company for polluting a natural water course by discharging therein the water from its mine. That case does not decide that a manufacturing company whose location cannot be changed

has any greater right than any other person to pollute the water of a stream without liability to persons having a right to the use of the water; but the opinion is based upon the fact that the character of the water had not been changed. In the opinion the court uses this language: "It will be observed that the defendants have done nothing to change the character of the water, or to diminish its purity, save what results from the natural use and enjoyment of their own property. They have brought nothing on the land artificially. The water as it poured into Meadow Brook is the water which the mine naturally discharges; its impurity arises from natural, not artificial causes. The mine cannot, of course, be operated elsewhere than where the coal is naturally found, and the discharge is a necessary incident to the mining of it."

The distinction between that case and the case at bar is apparent. The mining company threw into the stream water which was naturally impure; in the case at bar the city has thrown into the stream water which the city has made impure. In the one case the water flowed in its natural state, while in the other, artificial means had changed the very nature and character of the water.

It has long been the settled law of this State, that for consequential injuries resulting from the construction, maintenance or operation of sewers, streets, and other public works, in the absence of negligence or want of due care and skill, a municipal corporation is not liable. *Macy* v. *City of Indianapolis*, 17 Ind. 267; *Weis* v. *City of Madison*, 75 Ind. 241; *Rice* v. *City of Evansville*, 108 Ind. 7; *City of Terre Haute* v. *Hudnut*, 112 Ind. 542; *Cummins* v. *City of Seymour*, 79 Ind. 491; *City of Evansville* v. *Decker*, 84 Ind. 325.

"The improvement of streets and alleys by a municipality is a lawful act, and if unavoidable injury ensue

no liability results. That which the law authorizes is not a nuisance so as to give a right of action. *Transportation Co.* v. *Chicago*, 99 U. S. 635; *Chicago, etc., R. R. Co.* v. *Loeb*, 118 Ill. 203, 59 Am. Rep. 341. But the negligent and unskillful action on the part of the municipality is a nuisance, and when private property is injured, the city must respond in damages." *Stein* v. *City of Lafayette*, 6 Ind. App. 414.

Counsel for appellant cite the case of *Barnard* v. *Sherley*, 135 Ind. 547, and upon the authority of that case ask a reversal of the case at bar. In *Barnard* v. *Sherley, supra,* appellee sued appellants for polluting a natural stream of water by discharging therein water from certain bath houses used in connection with an artesian well, the waters from which were claimed to possess curative properties for certain diseases. The complaint asked injunctive relief, and also damages. The question presented for decision in that case was, as stated in the opinion, "Whether one who sinks an artesian well upon his own land, and uses the water to bathe the patients in a sanitarium or hospital erected by him on said premises, is liable to injunction and damages for allowing the water to flow into a stream which is the natural water course of the basin in which the artesian well is situated, the owner being free from negligence or malice and using all due care in avoiding injury to his neighbor." The learned judge who wrote the opinion in that case says: "No principle of law is better settled than that a man has the right to the lawful use and enjoyment of his own property, and that if, in the enjoyment of such right, without negligence or malice, an inconvenience or loss occurs to his neighbor, it is a wrong for which there is no liability. * * * * No man is answerable in damages for the reasonable exercise of a right,

where it is accompanied by a cautious regard for the right of others, where there is no just ground for the charge of negligence or unskillfulness, and where the act is not done maliciously."

That case was decided upon the sufficiency of the second paragraph of answer, which alleged that the well was dug, and its waters caused to flow upon appellant's lands by an association of citizens with the assent and approval of appellee; that the waters from the well flowed into a stream which, after running through the city, passed over lands of appellee and for more than a year so continued to flow with the acquiescence of appellee; that the only means or way of escape of the water from said well is in and along said branch, which is the only natural outlet for the same, and that the increase of the flow of water in the stream was not materially increased by the water from said well; that by analysis it was discovered that the waters were of great medical value, and possessed of curative properties in the healing of persons afflicted with various diseases; that thereupon for the purpose of utilizing said waters for the cure of persons so sick and afflicted, appellants erected upon their said lot a bath house, at a great cost, in which they have since continued to treat those afflicted, using said waters. This paragraph of answer was held sufficient, for the reason that it appeared due care had been exercised in the premises; that the business in which appellants were engaged was a lawful one, and that it was conducted in a lawful manner. In the opinion in that case the court said: "The natural right to have the water of a stream descend in its pure state, must yield to the equal right of those above. Their use of the stream for mill purposes, and the other manifold purposes for which they may lawfully use it, will tend to render it more or less impure. The

water may thus be rendered unfit for many uses for which it had before been suitable; but so far as that condition results from a reasonable use of the stream, in accordance with the common right, the lower riparian proprietor has no remedy. When the population becomes dense, and towns or villages gather along its banks, the stream naturally suffers still greater deterioration. Against such injury, incident as it is to the growth and industrial prosperity of the community, the law affords no redress. So, in cities and towns, with their numerous inhabitants and diversified business, with their mills, shops, and manufactories; with their streets and sewers; all the products and means of a high civilization, it would be impossible that the pure streams that flow in from the farm sides should remain uncontaminated; and those that live upon the lower banks of such streams must, for the general good, abide the necessary results of such causes. * * * * * * * * * In the case before us, the stream flowed through the heart of the city of Martinsville before it reached the lands of appellee. Will it be said that there is any liability for contamination from the refuse of a city? Must it be that one who lives on the lower lands on the banks of a stream shall forbid forever the founding of a city on the lands above; forbid the grading of streets, the building of sewers, the erection of mills, factories, hospitals, or other means of livelihood, comfort and convenience of the inhabitants."

The doctrine laid down in *Barnard* v. *Sherley, supra,* has been approved by the Supreme Court upon a second appeal of that case. *Barnard* v. *Shirley* (Ind. Sup.), 47 N. E. 671.

It is argued by appellees' counsel that if it be true that appellees had property in their plant, described in their complaint, then when the city discharged sew-

age into the river which destroyed the value of the plant, there was a taking of appellees' property by the city that brings the case within that provision of the constitution which provides that no man's property shall be taken by law without just compensation. But with this view we are unable to agree. Appellees' action is in tort for damages for injuries to their water rights and property from a nuisance, and is not an action for the value of property taken by the city for a public purpose. The legislature may confer upon a municipality the right to exercise the power of eminent domain, but such power does not exist without legislative enactment. Provision has been made by statute for the appropriation of lands for parks, streets, and the like, and methods provided for the assessment of benefits and damages; and statutes have been enacted for the appropriation of lands for rights of way for sewers, both within the corporate limits of the city, and for an outlet through lands without the corporate limits when sewers are built; but we know of no statute providing for the condemnation of lands along a water course into which a city may desire to discharge sewage. Until a statute confers such power upon a city, the power does not exist. Such a grant of power when made can be exercised only in the manner and to the extent conferred by the act. *Allen* v. *Jones*, 47 Ind. 438; *Water Works Co.* v. *Burkhart*, 41 Ind. 364; 1 Beach Pub. Corp., section 665; Tiedeman Munic. Corp., section 232; Cooley Con. Lim. 648.

The case at bar must be distinguished from that class of cases where an action will lie for maintaining a pest house, or slaughter house, or powder magazines and the like. In such cases the nature and necessities of the business are not such as prevent their removal.

In the case at bar, the building of the sewers was

a lawful act, and they were constructed where public necessity required they should be. The city did what it was authorized to do by law. The sewers were constructed upon the best modern improved plans, and there is nothing in the special verdict or in the pleadings that shows negligence or malice in either the construction or the operation of the sewers by appellant.

The principle underlying the decision in *Barnard* v. *Sherley* and which is controlling in the case at bar is, that "Where a work is lawful in itself, and cannot be carried on elsewhere than where nature located it, or where public necessity requires it to be, then those liable to receive injury from it have a right only to demand that it shall be conducted with all due care, so as to give as little annoyance as may be reasonably expected; and any injury that may result, notwithstanding such care in the management of the work, must be borne without compensation. It is then a case in which the interests and convenience of the individual must give way to the general good." *Barnard* v. *Sherley*, 135 Ind. 565; *Morse* v. *City of Worcester*, 139 Mass. 389, 2 N. E. 694; *Washburn, etc., Mfg. Co.* v. *City of Worcester*, 116 Mass. 458; *Merrifield* v. *City of Worcester*, 110 Mass. 216.

As there is nothing in the pleadings or the evidence or special verdict in this case which shows that the appellant failed to construct the sewers with due care or skill, or that the sewers were negligently operated and maintained, or that there was any malice on the city's part in constructing or operating the same, upon the authority of *Barnard* v. *Sherley, supra*, the judgment must be reversed.

Judgment reversed, with instructions to sustain appellant's motion for judgment on the special verdict.

Comstock, J., took no part in this decision.