**HIGHLAND REALTY, INC., Appellant (Defendant Below),**

v.

**INDIANAPOLIS AIRPORT AUTHORITY, Appellee (Plaintiff Below).**

No. 2–1276A463.

Court of Appeals of Indiana, Second District.

Oct. 17, 1979.

---

David H. Kleiman, Paul S. Elkin, Dann, Pecar, Newman, Talesnick & Kleiman, Indianapolis, for appellant.

Chalmer Schlosser, Jr., William L. Schlosser, Schlosser, White & Schlosser, Frank J. Otte, Indianapolis, for appellee.

BUCHANAN, Chief Judge.

### CASE SUMMARY

Appellant-defendant Highland Realty, Inc. (Highland) appeals from a judgment permitting the Indianapolis Airport Authority (Airport) to condemn its property, claiming the Airport had no authority to seize the land, that the seizure was neither necessary ·nor for a public purpose, and that no effort to purchase was made prior to suit.

We affirm in part and reverse in part.

### FACTS

On March 6, 1976, Robert A. Duncan (Duncan), property manager for the Airport, sent Highland a letter in which he offered One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) to purchase a tract of land owned by Highland.[1]

---

1. Duncan's letter reads as follows:
   The appraisals that were requested on the above real estate on September 17, 1975, have been completed and a report submitted to this office. *The appraisers have determined the fair market value of the subject real estate to be One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00).*

The tract, located several hundred feet from the edge of one of the Airport's runways, was the home of a trailer park which Highland had operated since 1936. Approximately a thousand people resided in the trailer park.

Duncan's offer, based upon two independent appraisals, was countered by an offer to sell for approximately three times that amount.[2] This counter offer was promptly refused by the Airport.

On May 12, 1976, the Airport filed suit to condemn Highland's property, claiming the land was needed to establish three distinct zones, a "clear zone", a "clear area protection zone", and a "noise buffer zone", as part of the Airport facility.

The trial court conducted a hearing which began on August 6, 1976, and included the following relevant uncontradicted testimony:

Duncan testified that as property manager of the Airport he was authorized by the Airport Board (Board) to purchase land which he deemed necessary for the operation of the Airport. He admitted that the Board was required to give final approval to any agreements he made, including the right to alter terms of an agreement, but in recent years the Board had always ratified his actions. He stressed that the offer submitted was within independent appraisals of the property's value and that the Airport was under a Federal Aviation Authority

(FAA) directive to acquire a clear zone. Board acceptance was a mere formality.

Daniel Orcutt (Orcutt), Executive Director of the Airport, testified that part of Highland's property was required to establish a "clear zone" at the end of one runway. A "clear zone" is a cleared, flat area at the end of all runways which permits additional clearance in case an aircraft should overshoot or undershoot the runway. The clear zone is vital to airport safety, and is required by FAA regulations for all airports receiving federal funds. Clear zones provide a margin of safety because of undershoots and overshoots, which occur approximately three hundred times a year in the United States.

Orcutt also testified that the Airport had not yet attempted to purchase two small commercial buildings located in the proposed "clear zone", because of lack of funds. However, he indicated condemnation of the Highland property was the more urgent need because of the larger area involved and because an aircraft overshoot into the trailer park could result in a major catastrophe.

He defined a "clear area protection zone" which was another reason for the Airport's acquisition of Highland's property, with the following testimony:

> Well, you are talking about the area that is either adjacent or off the end of

---

*The Indianapolis Airport Authority offers to purchase the subject real estate for the appraised fair market value of One Million Two Hundred Fifty Thousand Dollars ($1,250,-000.00).* This offer is for real estate only, as no mobile homes owned by Highland Realty, Inc., are to be purchased.

Under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Public Law 91–646, this offer constitutes the initiation of negotiations as defined by the act. Please be advised that *any person who enters into possession or occupancy as a tenant, or otherwise after the date of this letter will not be entitled to relocation benefits.* As per our earlier discussion with you on February 4, 1976, we have contacted appropriate federal agencies for a formal ruling regarding the questions of relocation benefits for persons who move into the park after the date of this letter.

The Indianapolis Airport Authority desires to acquire the real property constituting Trailer City through negotiation. *At our meeting of February 4, 1976, we advised you that the Airport Authority would pay the amount of our offer as delineated above in consideration of receiving a deed to the property,* and upon payment of a mutually agreeable ground rent, Highland Realty, Inc. would be authorized to operate Trailer City during the period of time required to relocate the park and its residents to a new location. We feel that a reasonable time to relocate the park and its residents would be two (2) years. (emphasis supplied)

2. Highland's price of $3,547,474.00 did not include sizeable relocation expenses of the residents of Highland's trailer park, which presumably the Airport was expected to assume.

runways in which you as the administrator expect to have a noise problem and of course it's the function of the type of aircraft, the number of take offs and landings and type of land use as well as your community's response to what has been the current practice.

However, a "clear area protection zone" is not defined or required by the FAA.

Regarding the need for a "noise buffer zone" to be created from another section of the Highland property, Orcutt presented a survey which indicated the affected land would suffer a serious noise problem by 1995. However, the Airport owns no other land classified in such a manner nor has the FAA developed any guidelines regarding the extent or necessity of such a zone. Orcutt admitted that one consideration in acquiring the land was to avoid possible inverse condemnation lawsuits in the future.

Thereafter, on November 12, 1976, at the conclusion of the hearing, the trial court allowed the Airport to condemn the *entire tract* of land sought for all the three zones indicated with these findings and conclusions:

1. Plaintiff, Indianapolis Airport Authority, is a municipal corporation organized and established pursuant to Chapter 283 of the 1961 Acts of the Indiana General Assembly, I.C.1971–19–6–2–1 thru 19–6–2–37 and has the power of eminent domain pursuant to the powers granted it under said Act.

2. Defendant, Highland Realty, Inc., is the record title owner of a parcel of real estate located in Marion County Indiana, which real estate is located adjacent to the Indianapolis International Airport, formerly known as Weir Cook Municipal Airport, said real estate being more particularly described as follows:

(formal description omitted)

3. The Court has jurisdiction of the subject matter of this action and of the parties.

4. That it is necessary for plaintiff to acquire the fee simple title to said real estate for its general public use, specifically, clear area protection zone, noise buffer area, and general public safety, and the Court specifically finds that such use is a public use.

5. That plaintiff has the right to acquire said real estate under the powers granted to it by its enabling legislation.

6. Defendant, Highland Realty, Inc., an Indiana corporation, is the owner in fee simply of said real estate which constitutes the entire parcel of land appropriated by plaintiff.

7. Plaintiff, prior to proceeding with condemnation, made a good faith effort to purchase said real estate from defendant, Highland Realty, Inc., but was unable to agree with said defendant for the purchase thereof.

8. Plaintiff has a need to acquire the fee simple title to said real estate for the use and operation of Indianapolis International Airport.

9. Plaintiff is entitled to appropriate said real estate under its power of eminent domain and said real estate should be condemned to plaintiff's use.

10. That the written objections of defendant to such appropriation should be overruled.

11. The Court finds that the proceedings were conducted in compliance with the law and that plaintiff has the right to exercise the power of eminent domain for the use sought.

### CONCLUSIONS OF LAW

1. That the law is with the plaintiff.

2. Plaintiff is an Indiana municipal corporation created by statute and charged with the responsibility of operating and maintaining Indianapolis International Airport.

3. Plaintiff has met the requirements of the law in exercising its power of eminent domain to appropriate the real estate owned by the defendant, Highland Realty, Inc.

4. Plaintiff is authorized by statute and has the right to exercise the power of eminent domain for plaintiff's intended use.

5. Plaintiff has a need to appropriate said real estate and that plaintiff's intended use of said real estate is a public use.

6. The written objections filed herein by defendant should be overruled.

THEREFORE, the court, being satisfied of the regularity of the proceeding herein, and having overruled the objections of the defendant herein, and the court being satisfied that the plaintiff has the right to exercise the power of eminent domain for the use sought in its complaint; . . .
Plaintiff, Indianapolis Airport Authority, shall appropriate and have the fee simple title to the following described real estate, situated in Marion County, Indiana, to-wit:

(formal description omitted)

together with the right of immediate possession thereto, all subject to the requirements of the law pertaining to actions in eminent domain, and the court appoints *George Long, Joseph Schwarz,* and *Maralee O'Brien,* three (3) disinterested freeholders of Marion County, Indiana as appraisers to assess the damages which said defendant may sustain by reason of the appropriation, and that after being duly sworn, according to law, they proceed to examine and assess said damages.

That said appraisers are hereby ordered to appear before this court at 12 o'clock p.m., on Nov. 17, 1976 to be sworn and receive their instructions, and the clerk of this court is hereby ordered to notify said appraisers to appear herein at said time and date.

■ While the parties treat this judgment as a final judgment we cannot. It merely determined that the Airport had authority to condemn Highland's property. No report of the appraisers or final monetary judgment appears in the court's entry (or in the record). It is merely an interlocutory order. *See So. Ind. Rural Electric Coop. v. Civil City of Tell City* (1979), Ind. App., 384 N.E.2d 1145.

**3.** A.R. 4(E) reads as follows:
No appeal will be dismissed as of right because the case was not finally disposed of

ISSUES

Highland raises these issues:
1. Was the Airport's power of eminent domain sufficiently broad to allow condemnation of the Highland property?

2. Did the Airport make a sufficient effort to purchase the property before filing suit?

3. Was the Airport's proposed use of the property for a public purpose?

4. Did the Airport make a sufficient showing of necessity before attempting to condemn the property?

As indicated, we raise, sua sponte, the issue that this is an appeal from an interlocutory order. *So. Ind. Rural Electric Coop., supra.* In that case this court dismissed an appeal identical to this one under Ind.Code 32–11–7–5, because that statute required appeal to be taken from an eminent domain action prior to the report of the appraisers, and therefore contravened *Ind. Rules of Appellate Procedure* 4(A) as to finality of judgments.

■ This appeal was filed prior to *So. Ind. Rural Electric Coop.* and used the identical incorrect procedure. However, due to the overriding public interest in a resolution of this controversy, and because the identical issues would be raised on a new appeal if we were to dismiss this action, we retain jurisdiction under Ap.R.4(E) and consider the issues raised by Highland in order to provide guidance to the trial court for its action on remand. *See Hansbrough v. Indiana Revenue Board* (1975), 164 Ind.App. 56, 326 N.E.2d 599; *Ingmire v. Butts* (1974), 160 Ind.App. 575, 312 N.E.2d 885; *Bell v. Wabash Valley Trust Co.* (1973), 156 Ind. App. 476, 297 N.E.2d 924; *Krick v. Farmers and Merchants Bank of Boswell* (1973), 151 Ind.App. 7, 279 N.E.2d 254; *Aocker v. Buell* (1970), 147 Ind.App. 422, 256 N.E.2d 587. Ap.R. 4(E).[3]

in the court below as to all issues and parties, but upon suggestion or discovery of such a situation the appellate tribunal may, in its

## DECISION

*ISSUE ONE*—Was the Airport's power of eminent domain sufficiently broad to allow condemnation of the Highland property?

*PARTIES' CONTENTIONS*—Highland contends that the Airport has no authority to condemn this property for the purposes claimed. The specific statutory provision which gives the Airport authority to condemn land, *Ind.Code* 19–6–2–17 (hereinafter referred to as § 17), only provides authority to seize land for airports, landing fields, and restricted zones, none of which are applicable here.

The Airport responds that § 17 is merely supplementary to Ind.Code 19–6–2–13 (hereinafter referred to as § 13), which allows condemnation of any property necessary for the continued growth and development of the Airport facility.

*CONCLUSION*—The Airport's authority to condemn Highland's property is limited to so much thereof as is necessary to establish a "clear zone."

Airport's authority to condemn property is found in two separate statutes. § 13, which the Airport claims gives broad authority, reads in relevant part as follows:

In addition to the powers and duties conferred upon it elsewhere in this act, such board shall have full power and authority to do all acts necessary or reasonably incident to carrying out the purposes of this act, including, but not in limitation thereof, the following:

.     .     .     .     .

7. *To acquire property*, real, personal or mixed, by deed, purchase, lease, condemnation or otherwise and dispose of the same *for.use or in connection with* or for administrative purposes of *the air-*

port; to receive gifts, donations, bequests and public trusts and to agree to conditions and terms accompanying the same and bind the authority district to carry them out; to receive federal or state aid and administer the same; to erect such buildings or structures as may be needed to administer and carry out the provisions of this act. (emphasis supplied)

Highland's response is that this broad, general grant found in § 13 is restricted by § 17, which reads in relevant part as follows:

The *board of any such district is authorized to exercise the power of eminent domain for the purpose of carrying out any of the provisions of this act* [19–6–2–1—19–6–2–41]; and to award damages to landowners for real estate and property rights appropriated and taken; and in case such board cannot agree with the owners, lessees or occupants of any real estate selected by them for the purpose herein set forth, they may proceed to procure the condemnation of the same as hereinafter provided, in addition thereto, when not in conflict or inconsistent with the express provisions of this act, may proceed under chapter 48 of the Acts of the 64th General Assembly (1905) [32–11–1–1—32–11–1–13] and/or any act heretofore or hereafter enacted amendatory, supplemental to or in substitution thereof which may be in force at the time, and the *provisions of such laws are hereby extended to airports and landing fields and restricted zones adjoining the same as provided for herein so far as the same are not in conflict or inconsistent with the terms of this act.* (emphasis supplied)

Therefore, argues Highland, as this property is neither being sought for purposes of a

discretion, suspend consideration until disposition is made of such issues, or it may pass

upon such adjudicated issues as are severable without prejudice to parties who may be

"landing field",[4] or "airport",[5] or "restricted zone",[6] the Airport has no authority to condemn it.

Both of these statutes were enacted at the same time (1961) as part of the Airport Authority District, Indianapolis. Section 13 is entitled Powers and Duties of the Board of the Airport Authority district and contemplates broad powers for the Board. The first sentence begins, "In addition to the powers and duties conferred upon it elsewhere in this act . . .."

Section 17 is titled Eminent Domain Procedures and its obvious thrust is to supplement Section 13 by defining the procedures to be utilized in exercising the power of eminent domain granted the Board in Section 13.

■■■ Our primary objective in construing statutes is to ascertain and give effect to the legislative intent. *City of Indianapolis v. Central Railroad Company of Indianapolis* (1977), Ind.App., 369 N.E.2d 1109; *Allen Co. Dept. of Public Welfare v. Ball Memorial Hospital Ass'n, Inc.* (1969), 253 Ind. 179, 252 N.E.2d 424, and in so doing we are mindful that:

> Statutes of eminent domain are in derogation of the common law rights of property and must be strictly followed, both as to the extent of the power and as to the manner of its exercise. *City of Indianapolis v. Schmid* (1968), 251 Ind. 147, 240 N.E.2d 66, 67.

In *City of Richmond v. Test* (1897), 18 Ind.App. 482, 48 N.E. 610, the court stated:

> Until a statute confers such power upon a city, the power does not exist. Such a grant of power, when made, can be exercised only in the manner and to the extent conferred by the act.

■■■ With these dual considerations as a guide we can find no limitation by Section 17 on the eminent domain power granted the Board by Section 13.

In essence Section 17 reads:

> The board . . . is authorized to exercise the power of eminent domain for the purpose of carrying out any of the provisions of this act . . . *in addition thereto*, . . . may proceed under [Ind.Code 32–11–1–1—Ind.Code 32–11–1–13] . . . and the provisions of such laws are hereby extended to airports and landing fields and restricted zones adjoining the same . . .. (emphasis supplied)

In the face of such language we can only conclude that Section 17 supplements rather than limits the eminent domain authority of the airport. The two sections are easily construed in pari materia. Effect can reasonably be given to the provisions of each. *City of Hammond v. Indiana Harbor Belt RR.* (1978), Ind.App., 373 N.E.2d 893; *Indiana Alcoholic Beverage Comm. v. Baker* (1972), 153 Ind.App. 118, 286 N.E.2d 174.

Thus, the Airport may condemn land, "for use or in connection with . . . the airport" (Section 13) and for "restricted zones adjoining the same" (Section 17).

Having dissected the statutory language, we must now ascertain whether the condemnation of the entire property for the three designated zones is permissible within the scope of these two sections.

### A. CLEAR ZONE

Although never adopted in this state, the general rule is that approach areas to an airport are considered a vital part of an airport facility. *Griggs v. County of Alle-*

---

aggrieved by subsequent proceedings in the court below.

**4.** Ind.Code 19–6–2–1 defines "land (landing) area" as "that portion of an airport or landing field designated, set aside, and used for the landing or taking off of aircraft.

**5.** Ind.Code 19–6–2–1 defines airports as: " . . . any location either on land or water or upon any building or other structure which

is used for the landing and taking off of aircraft, which provides for the shelter, supply or care of aircraft, or a place used for receiving or discharging passengers or cargo by air.

**6.** Ind.Code 19–6–2–16 discusses restricted zones as necessary to provide "free airspace" for the descent and climb of aircraft. Essentially, restricted zones appear to be required to protect the aircraft's glide path.

*gheny, Pennsylvania* (1962), 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed. 585; *Vance County v. Royster* (1967), 271 N.C. 53, 155 S.E.2d 790 (rev'd on other grounds); *Ackerman v. Port of Seattle* (1960), 55 Wash.2d 400, 348 P.2d 664.

Typical is *Port of Olympia v. Deschutes Animal Clinic* (1978), 19 Wash.App. 217, 576 P.2d 899, in which the Washington Court of Appeals, in construing a similar statute, found that acquisition of property for safety reasons was critical to an airport's operation.

Clearly, the acquisition of property for the purpose of increasing the safety of the airport by providing an unobstructed view of the approach lights is a proper airport purpose. The acquisition of the east 150 feet by the Port of Olympia is not an improper attempt to exercise the power of eminent domain in excess of statutory delegation. *See Des Moines v. Hemenway,* 73 Wash.2d 130, 437 P.2d 171 (1968).

In *Port of Seattle v. Insernio* (1967), 72 Wash.2d 932, 435 P.2d 991, the court specifically approved acquisition of a "clear zone" as coming within the scope of that statute.

The Indiana legislature in adopting Section 16 (Ind.Code 19–6–2–16) of the Airport Authority District explicitly recognized the dire need for protection of life and limb by allowing the Airport to create restricted zones to limit the height of structures in order to safeguard the integrity of the aircraft glide paths. But even more critical is the need of airports to create *cleared* areas at the ends of all runways in order to minimize the risks created by the inevitable miscalculations or mechanical failures that occasionally occur in take-offs and landings.

Section 16 specifically provides for "the removal of, all buildings, towers, poles . . and other structures . . . which interfere with such gliding angle . . . " Inasmuch as the Board is given broad power to remove all buildings or structures as may interfere with he gliding angle, it is not a distortion of the language used to construe the legislative intent as contem-

plating the Board's right to remove (clear) all structures when the gliding angle is not a normal one. Or, overshoots and undershoots may on occasion be the "gliding angle". The legislature quite properly sought to assure public safety in this manner.

In accordance with its authority, Airport has already acquired "clear zones" at the ends of all runways, except the one involved in this litigation. A "clear zone" is classified by the FAA as a critical safety factor, and has been recognized as a necessity by several jurisdictions.[7] Only a judiciary with its head ostrich-like in the sand would be unaware of the recent history of tragic aircraft crashes at major airports in urban areas. We can take judicial notice of the potential holocausts resulting from undershoots or overshoots in congested areas. *Sumpter v. State* (1976), 264 Ind. 117, 340 N.E.2d 764; *Fox v. Galvin* (1978), Ind.App., 381 N.E.2d 103. The FAA recognizing the inexorable concentration of aircraft flight paths at ever expanding airports have adopted manageable guidelines to control acquisition of property for "clear zones", and Indiana statutes are in harmony therewith.

■ Thus, so much of Highland's property as may be needed to establish a "clear zone" may be condemned.

### B. NOISE BUFFER ZONE AND CLEAR AREA PROTECTION ZONE

It is a different story when we approach noise zones. There is no clear legislative authority to condemn in order to create zones around an airport to serve as a buffer around a clear zone or to eliminate noise pollution. We are cognizant of the intrusive nature of eminent domain proceedings:

The power of eminent domain—the right to appropriate for public use the private property of the citizen against his will— has been characterized as a "very high and dangerous one", and appellee cannot exercise that power for the purpose

7. *See Vance County v. Royster, supra; Port of Seattle, supra.*

named in this proceeding unless it is able to show clear legislative authority for so doing.

*Kinney v. Citizens Water & Light Co.* (1909), 173 Ind. 252, 90 N.E. 129, 130.

Our research has revealed no cases in the United States which have allowed condemnation of a "clear area protection zone", and only one allowing a "noise buffer zone," [8] nor are such zones defined or recognized by the FAA. The use of the former as indicated by the evidence in this case, as well as the latter, is to protect residents in the area from noise pollution by in effect seizing their homes.[9] We simply find no authority for such a condemnation under any applicable Indiana statute. The only evidence supporting such a taking is a noise contour map for the year 1995.

■ So the condemnation of any portion of Highland's property for a "clear area protection zone" or a "noise buffer zone" is not authorized by law.

*ISSUE TWO*—Did the Airport make a valid "effort to purchase" before condemning this property?

*PARTIES' CONTENTIONS*—Highland contends that the Airport failed to make a valid "effort to purchase" before instituting condemnation proceedings. Duncan's letter [10] did not constitute a statutorily required offer to purchase because the Airport had a right to modify the terms even if accepted by Highland. Thus, having failed to comply with the procedural precedent, the condemnation action is invalid.

The Airport replies that Duncan's letter did constitute a valid offer, and that the subsequent right of approval by the Airport Board was a mere formality. Therefore,

under the circumstances of the case, the Airport made a good faith "effort to purchase."

*CONCLUSION*—The Airport did make an "effort to purchase" as required by statute.

Ind.Code 32–11–1–1 of the Indiana Eminent Domain Statute reads as follows:

Before proceeding to condemn, such person, corporation or other body may enter upon any land for the purpose of examining and surveying the property sought to be appropriated or right sought to be acquired; and *shall make an effort to purchase* for the use intended such lands, right-of-way, easement or other interest therein or other property or right. (Emphasis supplied)

*Wampler v. Trustees of Indiana University* (1961), 241 Ind. 449, 172 N.E.2d 67, explains what constitutes an effort to purchase:

What constitutes a "good faith" or "bona fide" offer to purchase? Each case must be determined in light of its own particular circumstances. However, the authorities generally indicate that where there is disagreement regarding the value of property, if a reasonable offer is made honestly and in good faith and a reasonable effort has been made to induce the owner to accept it, the requirements of the statute for an offer to purchase have been met. 18 Am.Jur., Eminent Domain, § 319, p. 962; 29 C.J.S. Eminent Domain § 224(b), p. 1167.

■ Although we find no Indiana case precisely in point, as a general rule, offers by an authorized agent are effective, even if non-binding at the time made, if these offers need to be, and are, subsequently ratified by the parent organization.[11] Thus,

---

8. The area designated as a "noise buffer zone" was that forecast to be at a noise factor level (NEF) of 30 by 1995. It was defined by Orcutt as "the area that is either adjacent or off the end of the runway in which you as the administrator expect to have a noise problem." *See County of Orange v. Metropolitan Transportation Authority* (1971), 71 Misc.2d 691, 337 N.Y. S.2d 178.

9. Airport also argues a "noise buffer zone" is necessary to protect the airport from inverse condemnation suits, a somewhat speculative claim from the record before us.

10. See footnote 1.

11. Additionally, as a general rule an offer made by an authorized agent binds the principal without further action. *Burger Man, Inc. v. Jordan Paper Products* (1976), Ind.App., 352 N.E.2d 821.

in *Aronoff v. City of Dallas* (1958), Tex.Civ. App., 316 S.W.2d 302, subsequent ratification by the city council of an offer made by its agent was sufficient to support a condemnation. And in *Prather v. Fulton County* (1960), Ky., 336 S.W.2d 339, an offer by an agent which was unofficial until approved by the fiscal court, was still sufficient to support a condemnation suit. *See generally* 90 A.L.R.2d 204.

Additionally, in *Re New York* (Forty-First Street) (1892 Supp.) 63 Hun 632, 45 N.Y.S.R. 334, 18 N.Y.S. 536, aff'd *Re New York* (Wharf Property), 135 N.Y. 253, 31 N.E. 1043, the New York Court of Appeals supported a condemnation suit although the negotiations were subject to final approval by the board of sinking fund commissioners; and the negotiating body was not permitted by law from making an offer sufficient that the owner's acceptance of it would immediately result in a final settlement.

In this case, the questioning of Mr. Duncan contained the following exchange:

Q Did the board of the Airport Authority authorize the specific offer to purchase Trailer City made on March 10, 1976?

A The board . . . recalling from my memory now . . . the board back at the inception of the project by approving the grant authorized the acquisition of the real estate pertaining to the grant . . . that is my recollection of their authority. *They did not give specific authority from parcel to parcel until I presented them with a purchase option from the property owner which they either approved or disapproved . . . when that was presented to them along with a copy of the appraisal.*

Q Is that not an unconditional offer to purchase subject only to being accepted by the offeree?

A *It is an offer to purchase from me as a representative of the board.*

Q To purchase on your own behalf or for the Airport Authority?

A The Airport Authority.

Q Now the letter says 'the Indianapolis Airport Authority offers to purchase the subject real estate.'?

A *I have the authorization from the board to make offers for the acquisition of real estate.*

Q Is your authorization subject to the approval of the board thereafter?

A *It is a technical legal requirement to satisfy* our treasurer who would have *to satisfy the State Board of Accounts* to show that the board has knowledge of that expenditure.

Q In other words . . . the board, itself, did not have knowledge that this offer was being made?

A This particular offer . . . no . . . it doesn't have . . . I may make 30 or 40 offers a year for the acquisition of real estate under my authority to do so.

Q My question is whether or not the Airport Authority Board could have attached other terms and conditions to this offer if it had been accepted by the offeree?

A Dollar value?

Q Any terms or conditions which would have varied this offer?

A I imagine they have the power but for the last three and one half years they have never done it.
(Emphasis supplied)

Duncan, in his capacity as property manager for the Airport was authorized to purchase various parcels of land pursuant to a Federal grant. Although the Airport Board did not specifically approve of each parcel, they did give him a general authorization for acquisition. Duncan's offering price for this property was well within the amount recommended by two independent appraisals. And, in three and a half years, encompassing approximately one hundred fifty parcel purchases, the Board approved every purchase.

Under these circumstances the Airport made a sufficient offer to purchase to satisfy the requirements of the statute. *Soft*

*Water Utilities, Inc. v. LeFevre* (1974), 159 Ind.App. 136, 308 N.E.2d 840; *Yellow Manufacturing Acceptance Corp. v. Voss* (1973), 158 Ind.App. 478, 303 N.E.2d 281.

*ISSUE THREE*—Is the condemnation to be made for a public purpose?

*PARTIES' CONTENTIONS*—Highland contends that the taking of this property is essentially for a private purpose. It claims the three asserted justifications, noise protection, resident protection, and aircraft protection are not sufficient public benefits to support the taking. The former two reasons are solely benefits to residents of the trailer park and not to the general public.

Further, it suggests that the latter reason, aircraft protection is invalid because the Airport has failed to acquire a commercial building which is located in the proposed clear zone. This, combined with the Airport's admission that population density of the trailer park was a factor in determining which parcels to condemn, leads Highland to conclude that aircraft safety was merely an incidental purpose to acquisition of the "clear zone."

The Airport replies that collision of an aircraft with the trailers would result in a major catastrophe with possibly hundreds of fatalities. This protection of both aircraft and residents is a public purpose under the statute.

*CONCLUSION*—Condemnation of Highland's property for a clear zone is for a public purpose.

Although no Indiana cases have decided whether condemnation of a clear zone is public purpose, several other states have considered the question.

In *Vance Co. v. Royster, supra,* (rev'd on other grounds), the North Carolina court noted that an acquisition of land to clear it of trees in order to permit the safe approach and departure of airplanes from the airport was a public use, noting that such a taking was reasonably incidental to the construction of such an airport. *See also Griggs v. County of Allegheny, supra; Ackerman v. Port of Seattle, supra.*

In *County of Orange v. Metropolitan Transportation Authority* (1971), 71 Misc.2d 691, 337 N.Y.S.2d 178, a New York court dismissed an injunction seeking to stop the acquisition of land near an airport for runway extension, facilities, and noise buffer zones, holding, "But at this stage in the history of aviation and public transportation, there can be no genuine doubt that the creation or expansion of an airport is a public purpose for which the power of eminent domain may be validly exercised." *See 2–A Nichols on Eminent Domain,* § 7.514.

The Washington Supreme Court has repeatedly held that acquisition of land for safety purposes only is for a public use. In *Port of Seattle v. Inserno, supra,* the court specifically approved the acquisition of a "clear zone" as a public use. Similarly, *Port of Olympia v. Deschutes Animal Clinic, supra,* approved the acquisition of a navigation easement to remove all structures from property in order to insure that the view of the runway approach lights was unobstructed.

Finally, if more is needed, the court in *Silver Bow County v. Hafer* (1975), 166 Mont. 330, 532 P.2d 691, allowed an airport to acquire an easement in order to remove all structures from a parcel that was needed for a clear zone.

■ Supported by the weight of these authorities and the undisputed testimony indicating that collision of an aircraft with the various structures on Highland's property could result in destruction of the aircraft with a potential loss of many lives, we have no reservations in determining such an acquisition to be a public use.

Nor do we find the Airport's heed for the potential loss of life to the one thousand residents of Highland's trailer park inappropriate. In considering whether private benefits would defeat the public nature of a condemnation, the Indiana Supreme Court has observed in *First National Bank v. Penn-Harris-Madison School Corporation* (1967), 249 Ind. 200, 231 N.E.2d 238, 240, quoting from 53 A.L.R. 12 & 13:

The general rule is well settled that the exercise of eminent domain for a public purpose which is primary and paramount will not be defeated by the fact that incidentally a private use or benefit will result which would not of itself warrant the exercise of the power.

. . . a use which is in itself of a public character, justifying the exercise of the power of eminent domain, does not lose its character as such by the fact that the exercise of the power for such use will incidentally result in a private use or benefit. *Wisconsin River Improvement Co. v. Pier* (1908), 137 Wis. 325, 118 N.W. 857, 21 L.R.A. (N.S.) 538; 20 C.J. 556, note 67.

■ The obvious overriding purpose of the safety of occupants of aircraft involved in overshoots and undershoots is more than justification for a public acquisition of Highland's property. The private benefit [11] which might be received by residents is incidental to and certainly a factor in the Airport's determination that the land should be condemned. The fact that the Airport chose to condemn land containing hundreds of structures rather than a single commercial structure in no way renders their decision suspect.

In conclusion, acquisition of the clear zone was for a public purpose as required by law.

*ISSUE FOUR*—Did the Airport make a sufficient showing of public necessity to warrant condemnation?

*PARTIES' CONTENTIONS*—Highland contends that there is no discernible standard by which to determine if the condemnation was arbitrary. Further, Highland argues that as there is no public purpose served by this condemnation, the Airport has failed to show necessity.

The Airport responds that under the agreement with the FAA, and under FAA regulations the Airport was required to acquire the property. There was a sufficient public interest in safety, noise pollution control, and to prevent the Airport from being encroached upon, that the taking was justified.

*CONCLUSION*—Condemnation of the "clear zone" was necessary.

■ What has previously been said applies as well to the necessity of the taking.

■ It is well settled that:

"A large discretion is necessarily vested in those [condemnors] who are vested with the power in determining what property and how much is necessary;"

. . . and that the condemnor's exercise of such discretion will not be disturbed unless "clear abuse" thereof has been shown. *Jensen v. I & M Electric* (1972), 257 Ind. 599, 603, 277 N.E.2d 589, 591.

It is not necessary, however, for the appellant to show an absolute or indispensable necessity for this taking. What is necessary land is held to be such as is reasonably proper, suitable and useful for the purpose sought . . . *Indianapolis Water Co. v. Lux* (1956), 224 Ind. 125, 134, 64 N.E.2d 790, 793.

One of the requirements imposed by the FAA in granting funds for airport development is the acquisition of a "clear zone" at the end of the runway. 14 CFR § 151.9. "Clear zones" are calculated according to a complex test considering airline traffic capacity and size of serviced aircraft, and these zones exist at the end of all other runways.

Due to the compelling safety considerations discussed in the previous section, Highland has simply failed to demonstrate any abuse of discretion by the Airport in determining the necessity of condemning so much of this land as may be necessary for a clear zone, but not for a clear area protec-

---

11. We express *grave* reservations to Highland's claim that protection of its residents is a private benefit and not a public purpose. In *Colochico v. U. S.* (1968, N.D.Col.), 286 F.Supp. 507, the court determined that acquisition of a buffer safety zone around an ammunition loading zone was a public purpose although the sole reason for such a move was to protect residents in that area from the dangers of explosion.

tion zone or for a noise buffer zone. The latter determination is for the legislature.

Therefore, the judgment is affirmed only insofar as Highland's land is needed for a clear zone and is otherwise reversed, and we suspend further consideration of this case, retain jurisdiction, instruct the trial court to enter a final judgment determining the amount and valuation of Highland's property needed as a "clear zone," and to certify its entry thereof to the clerk of this court, and to effect any further proceedings consistent with this opinion. An aggrieved party may then, if necessary, file a Motion to Correct Errors addressed to such final judgment pursuant to TR. 59, and following the trial court's ruling on such motion, a supplemental record may be praeciped and submitted and supplemental briefs filed in accordance with the normal appeal process. In the event no Motion to Correct Errors is filed or no appeal pursued following entry of final judgment, this appeal shall be dismissed.

SULLIVAN and SHIELDS, JJ., concur.